600 P.2d 1149

FIRST REALTY & INVESTMENT CO., INC., a corporation, Plaintiff and Counterdefendant, Respondent,

v.

Milton T. RUBERT and Lynne H. Rubert, husband and wife, Defendants and Counterclaimants, Appellants.

No. 12290.

Supreme Court of Idaho.

Oct. 3, 1979.

494

McLaughlin Law Offices, Chartered, Michael R. McLaughlin, Mountain Home, for defendants and counterclaimants, appellants.

Jeff Stoker, of Johnson & Stoker, Rayborn, Rayborn & Ronayne, Twin Falls, for plaintiff and counterdefendant, respondent.

BISTLINE, Justice.

Following very extensive discovery procedures over a long period of time this action became at issue and a trial to a jury commenced on February 23, 1976. The basic nature of the issues is best stated by the exact language of the court's given instruction No. 10:

"Ladies and Gentlemen of the Jury. In this case, the Plaintiff, First Realty & Investment Co., a corporation, seeks to recover from the Defendants, Milton T. Rubert and Lynne H. Rubert, husband and wife, the sum of $16,500.00 which Plaintiff claims is due and owing to it, the corporation, from the Defendants, Mr. and Mrs. Rubert, as a result of a promissory note executed by the Defendants to the Plaintiff.

"The Defendants do not deny the note was executed, or signed, by them but do allege they are not liable for the amount of the note, to the Plaintiff, because of failure of consideration and/or fraud or duress in obtaining the execution of the note.

"Thus, these defenses of the Defendants, called affirmative defenses, are major issues for consideration in the case and the Defendants have the burden of proving the affirmative, or the factual existence, of these defenses or either of them.

"The issues then, for your consideration, is to ascertain from the evidence and the law as explained in these instructions, whether Defendants have proved by a preponderance of the evidence the existence of the following:

"1. A failure of consideration for the execution of the promissory note;

"2. That the Plaintiff, by or through its agents, obtained the execution and delivery of the note through fraud or duress."

Both parties had requested the submission to the jury of numerous special interrogatories, but the court gave the jury only the two foregoing questions to answer, doing so by way of special verdict. At an instructions conference the court explained to counsel his reasons for so doing.

"THE COURT: I might say while we are on this subject of the manner in which the matter will be submitted to the jury, I have made every effort that I could to simplify the issues within the framework of the evidence, primarily for the benefit of the jury. I think we must remember that we are dealing with sophisticated business matters and sophisticated legal matters as well, and I think—it's certainly my purpose to submit the matter to the jury on the factual issues as simply as possible for the benefit of their consideration, and I feel these two questions are the primary issues in the case, and submitting these two issues in the form of special interrogatory is appropriate. Now, also I would state that I appreciate your submission, both parties, of several interrogatories. The problem I had with those is if we submitted all of those issues to them in that form very possibly we could come up with no verdict. There would be conflicts therein, particularly since each instruction would

have to bear or each special question would have to bear with it the instructions on which party has the burden upon that particular issue. So, in effect, I have boiled it all down. I think both of those questions which you have submitted are issues but I think most of them are included within these two ultimate issues which will be submitted to the jury."

Neither party voiced any objection to the court's decision and reasons for utilizing a special verdict with the foregoing two interrogatories, and neither party registered any objection to the court's refusal of any of their numerous requested special interrogatories.[1]

I.R.C.P. No. 49 provides:

"Special verdicts and interrogatories— Special verdicts.—The district court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. *If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury.* As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict." (Emphasis added)

The trial court's observation that the controversy involved "sophisticated business matters and sophisticated legal matters as well" was not an overstatement. A point heavily relied upon by the Ruberts was that First Realty in initiating the action did not have possession of the note sued upon; the note was in an escrow in Arizona opened in a transaction between the DeModenas and the Lims, as respective sellers and buyers of what we will refer to as the Tucson mobile park. The Tucson mobile park had been owned by the Ruberts; they had employed Huff Realty to sell it, and authorized Huff to put it on the multiple listing service.

First Realty (and other Arizona firms) brought prospects to the Ruberts, but nothing developed, or could develop, because of a title defect which was later cleared up. Thereafter the Ruberts entered into an exchange agreement with the DeModenas— the Tucson mobile home park in return for a Mountain Home, Idaho, mobile home park owned by the DeModenas. As stated, at about the same time the DeModenas sold the Tucson park to the Lims. The Ruberts claimed that First Realty had no involvement, on their behalf at least, in that exchange and that they absolutely remained aloof from the DeModena-Lim transaction. First Realty claimed otherwise, contending that the Rubert-DeModena exchange was maneuvered into a tax-deferred exchange— for the benefit of the Ruberts, and that First Realty was instrumental on behalf of the Ruberts in bringing about the tax-deferred exchange, which First Realty asserted was a three-party transaction involving the Ruberts, the DeModenas, and the Lims. The Ruberts were sent the $16,500 note, refused to sign it, and later did, contending that they did so on the deceitful assurances of an employee of the agency which was to handle the DeModena-Lim escrow to the effect that it was a formality, and the Ruberts would not be obliged to pay the note.

*Homefinders v. Lawrence*, 80 Idaho 543, 335 P.2d 893 (1959), observing that First Realty's claim was not an oral contract listing, but a written note.

---

1. Ruberts' counsel stated only his objection that Instruction No. 10 did not set forth the fact that there is in Idaho, Idaho Code § 9–508 which governs real estate commissions. The court overruled the objection on the strength of

The foregoing is what we perceive to be the facts of the underlying controversy, which have been gleaned from the briefs and the appeal record.

Twelve jurors found no failure of consideration. Ten found no fraud or duress attendant to the execution and delivery of the note.

Thereupon the court entered findings of fact, setting forth the two findings on the special verdict, and finding also:

"1. That plaintiff, First Realty & Investment Co., Inc., a corporation, on or about the 15th day of May, 1972, provided that a promissory note was sent to the defendants in Idaho.

"2. That defendants, Milton and Lynne Rubert, received said promissory note on or about May 15, 1972, and that they signed and executed said instrument and returned it to Arizona Title and Trust Company of Tucson, Arizona, who was acting as plaintiff's agent in regard to the note.

"3. That the sending, by the defendants, of the promissory note to Arizona Title and Trust Company constituted a voluntary transfer of possession of the note."

The findings in the record are those set forth below. If any material findings have been omitted, the parties and this Court alike are bound by the final sentence of Rule 49 which states:

"As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

Judgment was entered for First Realty following which the Ruberts moved for a new trial, which was denied by memorandum decision. Ruberts appeal from both the final judgment against them and the order denying them a new trial.

On appeal the Ruberts outline eight issues of error:

I. Eleven different instances, referred to only by page and line, where the court improperly commented from the bench;

II. Failure to instruct on Ruberts' counterclaim and defense;

III. Admission of First Realty's Exhibits 2, 5, and 10;

IV. Admission of incompetent, irrelevant and immaterial testimony offered by First Realty witnesses— with page and line reference to where the testimony is found, 7 instances;

V. Denial of Ruberts' Exhibits A, B, D, N, and P, and certain testimony, unidentified other than by reference to page and line, 21 instances;

VI. Denial of Ruberts' counterclaim;

VII. Denial of Ruberts' motion for new trial based on newly discovered evidence;

VIII. "The verdict is not supported by the facts on consideration, revocation, and delivery."

We will dispose of each designated issue in turn.

■ *Issue I*: Although Ruberts in their opening brief cite authority for the proposition that a trial judge may not comment on the evidence or intimate to the jury the court's opinion, in not one single instance was any of the challenged comment set forth or argued.

Under such circumstances this issue is not entitled to consideration. See *Burton v. Bayly*, 50 Idaho 707, 300 P. 359 (1931).

■ Nevertheless, we have examined the reporter's transcript and find that the Ruberts did not once object to the remarks of the trial court of which they now for the first time complain in this Court. Such being so, any issue in that regard was not raised nor preserved for appeal. *State v. Greene*, 100 Idaho 464, 600 P.2d 140 (1979), and *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784 (1978). Because of the seriousness of the charge, and because counsel for First Realty did assume the task of placing a verbatim transcript excerpt of five of these incidents in respondent's brief, we have reviewed the challenges

which the Ruberts say show that they should be granted a new trial. The very first is:

" 'MR. McLAUGHLIN: Then, Your Honor, I object to it. Obviously not within the course of business as represented by counsel.

" 'THE COURT: Well, let me see the exhibit. (Exhibit handed to the court).

" 'THE WITNESS: But some of them, some of the names on there were put on Rubert under normal course.

" 'THE COURT: Well, the only way this would be relevant I think is if the defendant's calls are identified. You mentioned something about a telephone number Mr. Marsh.

" 'THE WITNESS: Yes, opposite on the left side it list the phone number in Idaho and it list a number, either be his home number or his mobile home number.

" 'THE COURT: All right, I'll allow it to be admitted on that basis.' "

Another instance is this:

" 'Mr. STOKER: Your Honor, subject to that I would ask to have that document admitted. I think the rule on secondary evidence is that if I filed a motion to produce I can use the copy.

" 'THE COURT: I agree. Let me see it. (Document handed to the court)

" 'MR. McLAUGHLIN: My point is there are eraser and correction ink and everything else on it.

" 'THE COURT: Anything further?

" 'MR. McLAUGHLIN: Yes. It is definitely a self-serving instrument.

" 'THE COURT: I appreciate that, but that's for the jury to give the weight to it. I think it is corroborative. I'll allow the document to be admitted.' "

and this:

" 'THE COURT: All right, the record may show all jurors have returned into open court and are in their proper places.

" 'I have received a note from one of the members of the jury which I have shown to counsel and the question basically is: What is meant by the term "arm's length." I'll try to explain it to you the best I can.

" 'An arm's length transaction or arm's length bargaining is basically where the parties are free to bargain without any outside influence. I could explain it best I suppose by giving you an example. The best example would be what you all do every day, you go into a store and you purchase something. We're free not to make a purchase or to make a purchase as we desire and, likewise, the store is free to sell it to you or not sell it to you as they desire. It means, basically, that it boils down to that: It is up to each party to bargain for their own best interest.

" 'We'll be hearing more about this I'm sure in the trial or the proceedings of the trial. I'll see if I can find and include in the court's instructions a more definitive legal definition of it when I have time to research that out.

" 'Okay, you may continue with your direct examination.' "

The foregoing are illustrative of the other challenged occurrences. No objection was made until this appeal, as stated, but in any event, we see absolutely nothing irregular or improper in any of the trial court's comments or remarks.

■ *Issue II*: Before the close of the trial the court removed Ruberts' counterclaim from the consideration of the jury; accordingly the court committed no error in not instructing on it.

■ *Issue III*: Exhibit 2 was a copy of a January 28, 1972, earnest money agreement for the sale by the Ruberts of their Tucson mobile home park—signed by one Kensinger and wife, which First Realty offered on the issue of failure of consideration. First Realty was endeavoring to show services performed by them in attempting to move the Ruberts property. The witness on the stand testified that Kensingers had responded to a First Realty newspaper ad. It was conceded that the Ruberts did not accept the Kensinger offer. The sole objection was "incompetent, irrelevant and immaterial." The objection was properly overruled.

■ Exhibit 5 was a copy of a letter from an officer of First Realty to Mr. Rubert, dated April 15, 1972, the original of which had been demanded, but which Mr. Rubert did not have. The copy was identified and offered. It was admitted over objection with the court's remark as shown above in our discussion of Issue I. The exhibit [2] appears material to the issues being tried, and the objections made were properly overruled.

■ Exhibit 10 was identified by the same First Realty witness as a copy of a letter of June 6, 1972, from the same First Realty witness to Mr. Rubert. Counsel for First Realty stated that he had lost or misplaced the original, but that a copy had been admitted by the Ruberts as true and correct in a request for admissions. At a later convenient time, with the jury excused, the court found in the court file the request and the response—in which response the writing of the letter was acknowledged—Ruberts' counsel examined it and it was admitted *without objection.* Ruberts cannot now be heard objecting to the introduction of the exhibit.[3]

*Issue IV*: We are referred to eight different pages for instances where it is claimed the court erred in admitting testimony alleged by Ruberts to have been incompetent, irrelevant and immaterial, none of which was explicitly set forth in their brief, with argument and discussion limited to the bare assertion that the trial court permitted its introduction, and, that of the exhibits 2, 5 and 10, was "improperly admitted and overwhelmed the jury with redundancy and duplication."

Despite the shortcoming of such appellate practice, and because First Realty has in its respondent's brief painstakingly reproduced the excerpts of the transcript showing the instances of which complaint is made, we have considered this issue, but find it to be without substance.

■ The first such instance, delineated by Ruberts only as page 8, line 7, occurred when First Realty's counsel was examining the same First Realty witness above mentioned, a Mr. Marsh, concerning his having met Mr. Rubert in Tucson in 1971. The following is taken verbatim from the transcript:

"Q. (By Mr. Stoker) Mr. Marsh, you testified that you met Mr. Rubert in Tucson in 1971?

"A. Yes, sir.

"Q. Had he come to Tucson, is that correct?

---

2. "First Realty & Investment Co., Inc.
Southern Arizona Bank Financial Center
4400 East Broadway, Suite 805
　　　　Tucson, Arizona 85711
　　　　April 15, 1972
"Mr. Milton Rubert
385 Sunrise
Twin Falls, Idaho
"Dear Mr. Rubert:
"I just spoke to Edythe regarding our commissions. As you know, Mrs. Palant has been hit hard with income tax which she has deferred until June 15th—and it was her understanding that the $16,500.00 would be forthcoming at closing or immediately afterwards.
"Since the Bank of Idaho is sending $25,-000.00 to close escrow it then has put you into position to get your $75,000 1st mortgage, as you suggested. This would then cover all your outstanding debts and plans for park improvements.
"Edythe said you and Lynne would understand the circumstances—she has over $6,000.00 in legal fees and long distance calls invested in this sale. Incidentally, my share is one-half of commissions because the trade did not close in time. I too asked for an income tax extension. It looks like we all have a problem.
"Edythe asked I write to tell you that our commissions of $16,500.00 is to be paid out of the $75,000.00 first mortgage. We are having the title company prepare a note for $16,500 without interest due between now and June 5th. This should give you ample time to arrange your first mortgage now that the $25,000.00 is committed to the closing of escrow.
"It appears like everything should fall in place even though there has been a multitude of problems and heartaches on both sides.
"We are looking forward to a successful close—
　　　　　　Sincerely,
　　　　　　Ed Marsh"

3. The exhibit discusses various items pertinent to the Tucson mobile home park and concludes by saying "Hope this will complete the transaction to everyone's satisfaction. Saw the bank again today and all sounds favorable for the loan in a few days."

"A. Yes.

"Q. And what was the reason for his coming?

"MR. McLAUGHLIN: Object, Your Honor. I fail to see the materiality of this.

"THE COURT: Overruled. I don't know what it is at this point. You can answer the question.

"THE WITNESS: Mr. Rubert came to Tucson to testify at a Board of Realtor's hearing that Mrs. Palant—

"MR. McLAUGHLIN: I do object to that, Your Honor.

"THE COURT: All right, I'll sustain the objection as to materiality at this time."

Ruberts in their reply brief argue this point for the first time, saying of it that "the court allowed testimony into the record that the respondent had known Milton Rubert sometime prior to 1971 and certainly this was not relevant to the issue at hand." The Ruberts do not advance any reasons how such introductory or preliminary matter, assuming its irrelevance, prejudiced their case in any way. If it was error, it was totally harmless. If it was not harmless, the burden was on the Ruberts to show both that it was error and prejudicial for the jury to become informed that Mr. Marsh and Mr. Rubert met in Tucson in 1971.

For a second instance of an allegedly improper evidentiary ruling, Ruberts refer us to page 10, line 23. First Realty has excerpted that line and page into its brief. Ruberts do not argue this in either of their briefs, and we see this challenge as bordering on the frivolous.[4]

■ The third and only other instance with which we will burden this opinion is a reference to page 24, line 9, where First Realty's counsel met with an objection while asking Mr. Marsh to explain the nature of the earnest money agreement, Exhibit 2 above discussed.[5] The Ruberts in their opening brief made no attempt to show why the court's ruling was erroneous,

4. The transcript shows the following proceedings, beginning on page 10, line 20:

"Q. Perhaps I can interrupt you here. Primarily in your firm—you mentioned that you were involved with the park—who primarily in your firm, First Realty & Investment Company, was working with Mr. Rubert in regard to the park?

"A. Edyth Palant of First Realty.

"Q. You mentioned that you thought you had some other phone calls with Mr. Rubert. Could you explain when these took place as best you can recall?

"A. Well, basically we talked of keeping in contact so that when the time came, when the park became available, that he would keep us posted and in that event that he would then give us permission to work on the sale of the park contingent of course on him getting the lawsuit all cleared.

"Q. Did he ever make contact with you after this trip then to Tucson where anything further developed in regard to this arrangement or agreement?

"A. I think the latter part of 1971 there was some contact by phone to Idaho regarding his case was getting cleared and it looked like we may proceed.

"MR. McLAUGHLIN: Just a moment, Your Honor. The problem is the questions are so general and things come out. Now, we have apparently a conversation at no time, place.

"THE COURT: All right, I'll request that you lay a foundation."
A foundation was laid, and the direct examination continued.

5. "THE COURT: All right, I'm going to allow it to be admitted.

"THE CLERK: Plaintiff's Exhibit 2 admitted.

"Q. (By Mr. Stoker) Mr. Marsh, directing your attention again to Plaintiff's Exhibit 2, would you explain what the nature of this type of contract is?

"MR. McLAUGHLIN: Just a moment, Your Honor, I'll object to that. The contract speaks for itself. My client has never signed it, acknowledged he never signed it, and it is a self-serving instrument.

"THE COURT: Well, I agree Mr. McLaughlin, but I think the jury is entitled to know what basically the document, what type of contract it is. I'll allow him to answer.

"THE WITNESS: This is a Deposit Receipt and Sale Agreement which when we make a sale of any of our property we write all of the particulars and the terms and the price of course we are selling the park (for); the buyer signs it, and then if it meets the approval of the seller then he also signs it. And it's our obligation to forward every offer that we get to the seller."

or how they were in any way prejudiced. Ruberts later argued in their reply brief that "By allowing this irrelevant evidence into the record the jury was confused rather than informed as to the nature and extent of the dealings between the appellant (Ruberts) and respondent (First Realty). This argument does not persuade us that there was any error or prejudice in allowing the witness to explain the function of this type of document.

Our examination of the other instances complained of does not reveal the commission of any prejudicial error in the trial court's evidentiary rulings.

*Issue V*: The Ruberts complain of the court's refusal of their Exhibits A, B, D, N, and P, and 21 different items of testimony (referenced by page and line) concerning which their opening brief argues only that such rulings, coupled with the complaints of their Issues III and IV, "resulted in an impression to . the jury that the appellant (Ruberts) had no defense." Following the submission of First Realty's brief which set forth and discussed these rulings, the Ruberts' reply brief in turn does discuss the rejection of Exhibits A, B, and D, and some of the rulings made on examination of Ruberts' witnesses.

■ Exhibit A was an affidavit of Mr. Marsh executed in November, 1972, in which he stated that the note sued upon was executed in his presence at Tucson. On cross-examination by Ruberts' counsel, Marsh was first asked if he was present when the note was signed by the Ruberts, and answered that he was not. He was then confronted with the affidavit and asked to read it aloud. He did so, and admitted his signature. Asked to explain, he did so, stating that he had at one time been under the impression that the note was in fact among papers in Arizona. On the exhibit being offered, the court sustained an objection based upon the premise that, while its use for impeachment was proper, where the witness admitted the con-

tradictory statement in the affidavit, it was inadmissible.

We see no error in that ruling. Ruberts in their reply brief state that the affidavit was offered as well to establish that the note had not been delivered to First Realty. This contention was not presented to the trial court, and will not be considered for the first time on appeal.

■ Exhibit B is a copy of the listing agreement by which the Ruberts placed their Tucson property with Huff Realty, on the multiple listing service. Of this exhibit and its being refused admission into evidence, Ruberts in their reply brief state that through this document they would have shown that First Realty "no longer had authority to sell the trailer park in Arizona." By its terms the listing expired on May 10, 1971. As pointed out in First Realty's brief, the exhibit was not properly identified by the witness then on the stand, who was not party to the document nor present when it was executed. Obviously Mr. or Mrs. Rubert could have supplied proper identification, but neither was asked to. Assuming that the identification was sufficient, we are not shown that any error in rejecting the exhibit was prejudicial. The action brought by First Realty was to recover on a written promissory note given in payment for a completed real estate transaction. The Court, in recognition of the defenses alleged by the Ruberts, stated that the Ruberts would be allowed to go into the history of the transaction, which Ruberts did not then do. We are not shown that this exhibit was improperly rejected where it was not properly identified.

■ Ruberts' offered Exhibit D was a copy of the agreement of exchange between the Ruberts and DeModenas, dated March 28, 1972. The witness on the stand, Mr. Marsh of First Realty, who by the way was the first witness to testify, although he knew what the document was, was unable to properly identify it.[6] The trial court committed no error in rejecting the exhibit for lack of identification. Ruberts in their

---

6. "Q. (By Mr. McLaughlin) Do you recognize that Exhibit D that has just been handed to you?

"A. This is the exchange agreement.
"MR. STOKER: Your Honor, at this time—

reply brief argue that they were prejudiced by the rejection of the exhibit, notwithstanding that the original of the same was stipulated into evidence a few minutes later when Mr. Rubert was on the stand. It is said that the prejudice to them was in the frustration of "the effort to attempt to impeach" Mr. Marsh, but this we are unable to comprehend. Nothing explains how the Ruberts could have impeached Mr. Marsh by use of their offered exhibit, a copy of the agreement for exchange. Moreover, when the original was placed in evidence as Exhibit 15, nothing precluded the Ruberts from seeking permission to recall Mr. Marsh for further cross-examination. Nor did anything preclude them from asking for Exhibit 15 when First Realty's counsel stated that he had the original of Exhibit D. We see nothing whatever suggesting prejudice or any error in the court's ruling out the exhibit for lack of proper identification.

Ruberts in their opening brief list their Exhibit N as a document which the court should have admitted, a contention which they did not discuss at all until First Realty pointed out that Exhibit N was admitted. Ruberts then in their reply brief concede that it was admitted, but proceed to argue that they were precluded in the presentation of their case by the court's ruling that their witness could not tell the jury the intent and purpose of the exhibit, the exhibit apparently being part of a transaction with which the witness had had no personal experience.

We have with painstaking care examined the Ruberts' contentions that other erroneous evidentiary rulings were made by the court in connection with offered testimony of Ruberts' witnesses, but find nothing establishing the commission of prejudicial error. The rulings, with which we will not further burden the record, are sound, and the testimony sought to be elicited appears to have been largely as to irrelevant and collateral matters. The trial court so ruled, and we agree.

■ *Issue VI*: Ruberts in their reply brief for the first time submit argument in support of their contention that it was error on the part of the trial court to take the counterclaim issue from the jury. The sum total of this argument is that "there was substantial evidence that the attachment was wrongfully obtained."

During the presentation of Ruberts' case an attempt was made to show the cost of attorney fees incurred by them as an element of their counterclaim. At this time the court made his ruling taking this issue from the jury:

"I think the main issue before us which we better face is the issue of the cause of action for wrongful attachment. It seems logical to me that a person or an entity such as the Plaintiff in this case which has in his hands a promissory note

"MR. McLAUGHLIN: Well, just a moment.

"MR. STOKER: —I would object to anything further because this is a copy and I think that Mr. Marsh has testified previously that he was not aware of the transaction taking place or aware of the documents themselves at the time the transaction took place.

"THE COURT: I don't know what is in the document, it hasn't come out yet. I will overrule the objection at this point. Continue Mr. McLaughlin.

"Q. (By Mr. McLaughlin) Go ahead and ignore your lawyer's instructions on that, Mr. Marsh, and answer as best you can what that is?

"A. This was something that I didn't look at very thoroughly, but it was brought out in the closing.

"Q. Have you seen that document before?

"A. I believe I did.

"Q. Is that the document that was in the escrow office?

"A. It was part of the closing papers.

"Q. Is that a copy of that document?

"MR. STOKER: Your Honor—

"THE WITNESS: It appears to be.

"MR. STOKER:—I'm going to object again. I think the initial question was to identify the document.

"THE COURT: Well, I think that's correct. In the interest of time, Mr. McLaughlin, I don't think the witness is going to be able to identify and authenticate this document.

"MR. McLAUGHLIN: He has seen it.

"THE COURT: That is not proper authentication and identification.

"MR. McLAUGHLIN: Very well.

"MR. STOKER: Your Honor, for the benefit of the court we have the original and intend to offer it at the appropriate time and with the appropriate witness for authentication."

is justified on suing on the note and seeking or obtaining a writ of attachment at the time of filing suit where the note is regular on it's face.

"I'm influenced by the fact that fraud is a defense to this action and it would also logically follow that if the note was obtained by fraud then that fact ought to enter into the basis for the action for wrongful attachment. I think there's another aspect to this case though that we must consider also, and that is the fact that if there is a defense to the note on the basis of fraud it is through the agent, and obviously the principal, the Plaintiff, would be bound by the fraud of the agent in inducing the execution and delivery of the note. I'm not so sure that that same logic follows where we're dealing with the wrongful attachment. There is no evidence that the Plaintiff, who by the way, is the one that instituted obviously the attachment was privy or party otherwise through legal implication with the fraud on the part of the agent which induced the execution of the note. I'm not so sure that we can impute that to the principal for the purpose of the wrongful attachment. And, again, the basis for the wrongful attachment is malice, lack of probable cause, and I think this would have to exist personally on the part of the principal, the one who comes in and sues on the note before the action can be sustained.

"I really feel that on the basis of the record the matter of the wrongful attachment should not be submitted to the jury.

"MR. McLAUGHLIN: I just want to point out, Your Honor, the acts of the agents, the principal is charged with constructive knowledge of the action and the fraud of the agent.

"THE COURT: Well, what you're basically saying is that you can impute malice and lack of probable cause to institute the attachment action, Mr. McLaughlin, but I'm not so sure that's correct. I think there has to be—basically it's an action based on malice. I think that malice has to be personal with the principal, particularly in the situation where the note is placed in the hands of the principal without any showing of any knowledge on the part of the principal as to the alleged fraud in the execution of the note. I can't help but come back to this basic situation, a person has a note in their hands due and regular on their face.

"MR. McLAUGHLIN: They didn't have a note in their hands at the time of instituting the suit, Your Honor. The deposition of Mrs. Olga Ivanis said she had possession of it. This suit was instituted without being in anyone's hands.

"THE COURT: Okay, I appreciate the point. I don't think that would make any difference though.

"Okay, that will be my ruling. Let's proceed.

"Call the jury back in please."

In seeking to uphold that ruling First Realty argues that the provisions of I.C. § 8–501, in effect when the attachment was levied, gave them the right to attach the property of the Ruberts as security for the satisfaction of the judgment sought in the action on the note—the note being a contract for the direct payment of money. They argue also that Ruberts' claim of wrongful attachment was based upon the theory that the suit itself was maliciously brought on an invalid note, and where the jury found the note valid, that theory of liability dissipated. Ruberts do not present any argument contrary to that view, and we are persuaded that the trial court committed no error in not allowing the jury to pass upon the issue sought to be raised by the counterclaim.

■ *Issue VII*: Ruberts' motion for a new trial was made on reasons specified as:

"1. That one of the jurors commented on the evidence prior to the submission of the facts to the jury and made the following comment: It looks as though the Defendant is a dead beat trying to beat a bill.

"2. That the plaintiff, in submitting under discovery the Agreement of Exchange between Mario DeModena and the defendant, removed essential and necessary portions of that exchange agreement consisting of the deeds from Mario DeModena to the defendant and the deed

from the defendant to Nolan Victor for payment of his real estate commission.

"3. That the defendant has discovered that the plaintiff's witness, Edward Marsh, denied collecting the Kensinger's deposit in the Kensinger-DeModena agreement when, in fact, he did withhold the deposit from the Kensingers.

"4. That this act could not have been known to exist nor could proof be produced until the denial of Edward Marsh of such facts.

"5. That there is insufficient evidence to justify the verdict and that it is against the law in that the court failed and refused to instruct the jury as to Idaho Code of 9–508.

"6. That the court failed to instruct the jury that the action on the account stated was dismissed and failed to instruct the jury that the duress defense was to the account stated in the letter of June 6, 1972, upon which the plaintiff cross-examined the defendant.

"7. That the plaintiff misrepresented to the court that documents had previously been admitted by the defendant which were in fact not admitted by the defendant.

"8. It states in Mr. DeModena's deposition on Page 14 and also in his July 3 Closing Statement that this defendant was to receive $10,046.66, which, in fact, the defendant never received.

"9. Plaintiff is asking for interest when the note specifically bears no interest."

The motion was supported by the affidavit of Mr. Rubert, to which were attached Annex A through Annex F. This affidavit did not purport to support ground (1), and with respect to any allegedly newly discovered evidence did not offer any reason to excuse the Ruberts for not having had such evidence available for the trial.

The trial court heard oral argument on the motion, and after taking it under advisement, denied it by a written memorandum decision stating as his conclusion:

"I have examined the allegations and am of the opinion that they are without merit sufficient to justify the granting of a new trial. The evidence is sufficient to justify and substantiate the jury verdict. The case took five days of trial and both parties had adequate opportunity to submit all relevant evidence. The instructions framed the issues for the jury to consider and decide. The alleged misconduct of a member of the jury has not been substantiated and any misconduct on the part of plaintiff's witnesses, as alleged, was subject to cross examination by the defendants, and the issues of inconsistencies or insufficiency of the evidence were adequately presented to the jury and were questions for the jury to determine."

■ We have reviewed the record, and find that the trial court is substantiated in the ruling made. A motion for a new trial is committed in the first instance to the trial judge who saw and heard the witnesses, and the granting or denying of a new trial will ordinarily not be disturbed without a showing of a manifest abuse of that wide discretion which is placed in the trial court.

■ *Issue VIII* : The jury by its verdict found that there was consideration for the note, and there was no fraud or duress in its execution and delivery. The trial court on the motion for new trial concluded that there was sufficient evidence to substantiate the verdict, and we have independently examined the record and reached the same conclusion. Findings of the trier of facts when supported by substantial, even though conflicting, evidence will not be disturbed on appeal. *Fowler v. Uezzell,* 94 Idaho 951, 500 P.2d 852 (1972).

We affirm the judgment and the order denying a new trial. Respondent First Realty recovers its costs including attorney fees on the appeal.

DONALDSON, C. J., and SHEPARD and BAKES, JJ., concur.

McFADDEN, J., concurs in the result.