850 P.2d 749

**Carl CURTIS, Plaintiff–Counterdefendant, Appellant–Cross–Respondent,**

v.

**Sandra FIRTH, Defendant–Counterclaimant, Respondent–Cross–Appellant.**

**No. 18871.**

Supreme Court of Idaho,
Boise, April 1992 Term.

March 23, 1993.

E. Lee Schlender, Hailey, for appellant.

Givens, Pursley, Webb & Huntley, Boise, for respondent. Robert E. Huntley, Jr. argued.

TROUT, Justice.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

This appeal arose from a district court action for personal injury and a cross action for collection of a promissory note, which was the culmination of ongoing litigation between a man and a woman who had shared a home and intimate relations over a period of ten years. Appellant Carl Curtis and respondent Sandra Firth (hereinafter referred to only by their surnames), began living together in Curtis' home in May of 1978. While the relationship began as a very loving one, the periods of happiness became less prevalent over time and were replaced by antagonism and violence. The couple's behavior was characterized by cycles of violence which commenced with Curtis becoming irritated and angry; then turning to verbal and sometimes physical abuse; and finally ending with him becoming loving again. Throughout much of this time, both Curtis and Firth turned to alcohol and drugs for entertainment or solace. Although the parties participated in counseling in an attempt to resolve their problems, the relationship continued to deteriorate. In 1988, while Firth was vacationing in California, Curtis evicted her from his home.

In the initial phase of this litigation, Firth sought to establish a common law marriage, and brought an action for divorce and the division of all marital proper-

ty. After a trial on the merits, the trial court determined that no common law marriage had been established because the parties had not held themselves out in the community as husband and wife. Although the court denied Firth an interest in Curtis' personal and real property, Curtis was ordered to pay significant financial support for rehabilitative purposes as well as Firth's attorney fees.

In a subsequent phase of the litigation, Firth brought a personal injury action seeking damages for battery and intentional infliction of emotional distress. She also sought punitive damages. At trial, she presented extensive expert testimony regarding Battered Wife Syndrome and Post Traumatic Stress Disorder. The jury returned a verdict in favor of Firth, awarding her $50,000 in compensatory damages for battery, $225,000 for intentional infliction of emotional distress, and $725,000 in punitive damages. Curtis appealed.

Because of the number of issues asserted on appeal, this Court will address them either as issues related to the trial, or as issues encompassed in the post-trial motions. Finally, issues presented by a cross-appeal brought by Curtis will be addressed.

## II.

## TRIAL ISSUES

**Intentional Infliction of Emotional Distress**

■ Curtis contends that Firth's claim for intentional infliction of emotional distress must fail because there was an insufficient showing of an accompanying physical injury or manifestation.

Unlike a claim for negligent infliction of emotional distress which requires a showing of physical injury or manifestation, *see Evans v. Twin Falls County*, 118 Idaho 210, 796 P.2d 87 (1990), a claim for intentional infliction of emotional distress has no such requirement. As we noted in *Evans:*

The four elements which a plaintiff must show to be able to recover for intentional infliction of emotional distress are: 1) the conduct must be intentional or reckless; 2) the conduct must be extreme and out-

rageous; 3) there must be a causal connection between the wrongful conduct and the emotional distress; and 4) the emotional distress must be severe.

118 Idaho at 220, 796 P.2d at 97 (citations omitted).

Although evidence of physical harm may bear on the severity of emotional harm, *Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 606 P.2d 944 (1980); *Davis v. Gage,* 106 Idaho 735, 682 P.2d 1282 (Ct. App.1984), it is clear that evidence of physical injury or manifestation is not a required element for the claim of intentional infliction of emotional distress. A review of the pleadings in this case indicate that only intentional infliction of emotional distress was pled or submitted to the jury; accordingly, Curtis' argument in this regard is without merit.

**Statute of Limitations**

■ Curtis asserts that much of Firth's claim for intentional infliction of emotional distress was barred by the statute of limitations, and that the trial court's failure to instruct the jury on the defense was reversible error. It is well established that a party asserting the affirmative defense of statute of limitations has the burden of establishing the applicability of the statute. *E.g., Hawley v. Green,* 117 Idaho 498, 788 P.2d 1321 (1990).

Regarding Curtis' claim, the trial court remarked in its memorandum decision:

With respect to the court's decision to omit the statute of limitations instruction, the court notes at the outset that the proposed instruction was not even submitted by the [appellant]. Prior to the instruction conference, the court ruled that the tort of intentional or reckless infliction of emotional distress is a continuing tort. On that basis, the instruction was refused. The court is still of the opinion that refusal of the instruction was proper and as a result sees no basis for a new trial.

Unfortunately there is nothing in the transcript of the proceedings or the record to give this Court any indication of when the trial court made its ruling on the "continuing tort," the basis for that ruling or if

there were any objections to that ruling at the time. The only indication of any discussion about the statute of limitations instruction appears in the clerk's handwritten court minutes which state: "Mr. Crist objection to not given instruc [sic] re: statute of limitation."

■ We have held that a trial court is under a duty to instruct the jury on every reasonable theory of the litigants which presents a basis for a claim of relief or a defense, where such theory finds support in the pleadings and the evidence. *State v. Eastman*, 122 Idaho 87, 831 P.2d 555 (1992); *Hodge v. Borden*, 91 Idaho 125, 417 P.2d 75 (1966). The trial court has an affirmative responsibility to assure that the jury is correctly instructed:

> While the requested instructions perhaps did not adequately define contributory negligence and perhaps did not show adequate application of that doctrine to the case at bar, nevertheless since the request for such instruction was made, it became the duty of the trial court to give proper instructions thereon.

*Hodge*, 91 Idaho at 136, 417 P.2d at 86 (citations omitted). Clearly the trial court has a responsibility to instruct the jury, even if the correct instruction is not proposed, so long as the request is made. The question then becomes whether an instruction on the statute of limitations should have been given.

According to the memorandum decision, the trial court based its denial of the statute of limitations instruction on a "continuing tort" theory. The Court has previously had occasion to discuss this concept, although admittedly in different contexts. *Farber v. State*, 102 Idaho 398, 630 P.2d 685 (1981), involved a tort claim filed by landowners against the state for the negligent design, construction and planning of a road project. The issue involved whether plaintiffs had timely filed their notice of tort claim. The Court acknowledged that this was a different question than when the statute of limitations would run, although cases interpreting the statute of limitations might be instructive. In permitting the landowners to wait until the project was completed before filing their notice of tort claim under I.C. § 6–905, the Court applied a continuing tort analysis. While it was acknowledged that the damages were ongoing throughout the project, the Court held that for the purposes of the tort claims notice provision, notice need not be given until the acts were completed so that the state would be in a position to investigate and assess the claim for damages. In so doing the Court distinguished the facts of *Farber*, where the wrongful acts were of a continuing nature, with those in *Ralphs v. City of Spirit Lake*, 98 Idaho 225, 560 P.2d 1315 (1977):

> In *Ralphs*, a single act caused the damage for which compensation was claimed. While the *damages* alleged were continuing, and their full extent unknown, the *act* complained of was completed, and *some* damages had apparently occurred, long before the notice of claim was filed. Here, the act complained of is in the nature of a continuing tort. While the damages complained of have occurred over a period of time, as in *Ralphs*, we feel that it is better policy to focus upon the *act* complained of, rather than the damages, in determining when the 120 day notice requirement of the ITCA is triggered. Thus the holding in *Ralphs* that "[w]here there is a coincidence of a negligent act and the occurrence of damages a 'wrongful act' has been committed" is not determinative of whether a "negligent act" should be defined as the first step in a continuing project, or as the project as a completed whole.

102 Idaho at 401, 630 P.2d at 688. Even though this case arose in the context of a notice of tort claims, the Court acknowledged that a tort should be analyzed for the purposes of time limitations according to whether it is simply one complete act with ensuing damages, or whether it consists of a series of continuous activities.

*Woodland v. Lyon*, 78 Idaho 79, 298 P.2d 380 (1956), discussed a continuing tort in the context of a water right. In that case defendant obstructed a stream bed which prevented water from flowing onto plaintiffs' property for four consecutive years. Plaintiffs then brought suit and ultimately

received a jury verdict. On appeal the Court held:

> The tort herein alleged is not a single wrong, but a continuing one, and appellant may, if the evidence supports his claim, recover for all injuries occurring within the statutory period, even though the obstruction occurred more than four years before the complaint was filed.

78 Idaho at 83, 298 P.2d at 381. It is clear that *Woodland* actually referred to *continuing damages* resulting from one tortious act, rather than *continuing acts*. Thus, while *Woodland* discussed a "continuing tort," it was not applied in the same sense as *Farber*.

*Streib v. Veigel,* 109 Idaho 174, 706 P.2d 63 (1985), addressed this troubling concept in the context of a professional malpractice action:

> If A sets a spring gun and two years elapse before B, a police officer, opens the door, has B's cause of action been barred by the statute of limitations? Or is the tort continuing in nature until B is damaged? Clearly the latter result should obtain. In the instant case, also, we hold that the tortious negligence is continuing in nature until plaintiffs suffer damage.

109 Idaho at 179, 706 P.2d at 68.

Unlike either *Farber* or *Woodland, Streib* refers to a situation where an act or acts occur but no damages arise for a period of time. This case was the genesis of the "some damage" exception to the plain reading of I.C. § 5–219(4), providing that no cause of action will be deemed to have accrued until "some damage" has occurred.

Thus the Court has used the words "continuing" and "tort" in three separate and very different contexts. Our task in the instant case is to determine which, if any, of those interpretations apply here. "Continuing tort" has been defined as:

> one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation, ...

54 C.J.S. *Limitations of Actions* § 177, at 231 (1987). This definition would seem to be more in line with the term as it was used in *Farber,* than the other two cases cited above.

█ It is also important to note what does not constitute a continuing tort. Wrongful acts which are separate and wholly dissimilar are separate causes of action and the statute of limitations begins to run from the time of the commission of each wrongful act. *Fox v. Higgins,* 149 N.W.2d 369 (N.D.1967). Thus it is important to distinguish between separate acts which may be assault, defamation, or battery, and a continuing course of wrongful conduct which constitutes intentional infliction of emotional distress.

In *Page v. United States,* 729 F.2d 818, 821–22 (D.C.Cir.1984), the court succinctly described the theory of continuing tort:

> It is well-settled that "[w]hen a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases." Since usually no single incident in a continuous chain of tortious activity can "fairly or realistically be identified as the cause of significant harm," it seems proper to regard the cumulative effect of the conduct as actionable. Moreover, since "one should not be allowed to acquire a right to continue the tortious conduct," it follows logically that statutes of limitation should not run prior to its cessation.

*Page* involved allegations by a veteran that the Veterans Administration subjected him to harmful drugs over a period of years. The court reviewed a number of cases in which the courts recognized the continuing tort doctrine where the tortious acts were ongoing, as distinguished from cases where the injuries continue after the tortious acts cease. The court held:

> We view the injury claimed by Page as gradual, resulting from the cumulative impact of years of allegedly tortious drug treatment. To us it seems unrealistic to regard each prescription of drugs as the cause of a separate injury, or as a separate tortious act triggering a new limitation period. Page charges precise-

ly the sort of continuous conduct accreting physical and mental injury that justifies characterization as a continuing tort. Resultingly, the cause of action Page stakes on continuous drug treatment did not accrue, and the statutory limitations did not come into play, until the allegedly tortious conduct came to a halt in 1980.

As we have indicated previously, the definition of intentional infliction of emotional distress requires that there must be a causal connection between the wrongful conduct and the emotional distress, and the emotional distress must be severe. *Evans*, 118 Idaho at 220, 796 P.2d at 97. By its very nature this tort will often involve a series of acts over a period of time, rather than one single act causing severe emotional distress. For that reason we recognize the concept of continuing tort, as it was originally applied in *Farber*, should be extended to apply in other limited contexts, including particularly intentional infliction of emotional distress. We note, however, that embracing this concept in the area of intentional or negligent infliction of emotional distress does not throw open the doors to permit filing these actions at any time. The courts which have adopted this continuing tort theory have generally stated that the statute of limitations is only held in abeyance until the tortious acts cease. *See, e.g., Page*, 729 F.2d at 818 and *Twyman v. Twyman*, 790 S.W.2d 819 (Tex. App.1990). At that point the statute begins to run. If at some point after the statute has run the tortious acts begin again, a new cause of action may arise, but only as to those damages which have accrued since the new tortious conduct began.

In applying the concept of continuing tort to the case before us we note at the outset that there was no objection by Curtis at trial to the testimony of Firth and others concerning the ongoing abusive actions of Curtis which began as early as 1980 and continued throughout their relationship. This is not a case where the wrongful acts, severe emotional distress and damages occurred at the same time and suit could have been brought when the actions first took place.

There was testimony that it was not until 1986 that the more severe psychological injuries were beginning according to Dr. Walker. Roberta Sawyer Betts, a marriage and family counselor who counseled both Curtis and Firth periodically between August, 1986, and May, 1990, also testified at trial that Firth's symptoms were excessive and not what she would normally expect to see when people go through a difficult divorce. All witnesses agreed that the tortious acts ceased when Curtis evicted Firth from his home in early 1988. As this litigation was commenced shortly thereafter, it clearly falls within the two year statute of limitations for this action.

When there is no substantial evidence to support a claim, the trial court may withdraw that issue and not instruct the jury on it. *First Realty & Inv. Co. v. Rubert*, 100 Idaho 493, 600 P.2d 1149 (1979); *Everton v. Blair*, 99 Idaho 14, 576 P.2d 585 (1978). We believe that there was no substantial evidence to support Curtis' claim that the intentional infliction of emotional distress action was barred by the statute of limitations and we, therefore, affirm the trial court's refusal to so instruct.

## Submission of Punitive Damages to the Jury

Curtis asserts that punitive damages were not warranted in this case, and that the trial court erred by submitting the issue of punitive damages to the jury. It is well established that punitive damages are not favored in the law and should only be awarded in the most compelling and unusual circumstances, and are to be awarded cautiously and within narrow limits. *Manning v. Twin Falls Clinic & Hosp., Inc.*, 122 Idaho 47, 830 P.2d 1185 (1992); *Soria v. Sierra Pac. Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706 (1986); *Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 665 P.2d 661 (1983).

The decision of whether to submit the question of punitive damages to a jury rests with the sound discretion of the trial court. *Manning v. Twin Falls Clinic & Hosp.; Garnett v. Transamerica Ins. Ser-*

*vices,* 118 Idaho 769, 800 P.2d 656 (1990); *Soria v. Sierra Pac. Airlines, Inc.* In reviewing the trial court's decision we examine the sufficiency of the evidence and determine whether the record contains substantial evidence to support an award of punitive damages. *Manning v. Twin Falls Clinic & Hospital.* As noted in *Cheney:*

> An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was "an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences." The justification for punitive damages must be that defendant acted with an extremely harmful state of mind, whether that state be termed "malice, oppression, fraud or gross negligence"; "malice, oppression, wantonness"; or simply "deliberate or willful." (Citations omitted).

104 Idaho at 905, 665 P.2d at 669. In the instant case, we are satisfied that the trial court did not abuse its discretion in presenting the issue of punitive damages to the jury. As discussed later in this opinion, there was extensive evidence presented at trial concerning Curtis' conduct toward Firth during their ten years together. We believe that there was substantial evidence presented on which a jury could have found Curtis' conduct to be an extreme deviation from reasonable standards of conduct. Similarly, the jury could have found from the evidence presented that Curtis acted with malice, oppression, wantonness, or gross negligence. Accordingly, we hold that the trial court did not err in submitting the issue of punitive damages to the jury.

### III.

### POST–TRIAL MOTIONS

**Judgment Notwithstanding the Verdict**

■ The standard for trial courts in ruling on a motion for a judgment notwithstanding the verdict was set forth in *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187 (1986). In making such a motion, the moving party necessarily admits the truth of all of the non-moving party's evidence, as well as every legitimate inference that could be drawn therefrom, and asks the court to rule as a matter of law that there was not sufficient evidence upon which the jury could properly find for the non-moving party. *Id.* In reviewing this, the appellate court applies the same standard as does the trial court which ruled on it initially, and reviews the decision fully without any special deference to the views of the trial court. *Id.*

■ It is Curtis' position that his motion should have been granted for several reasons. His contention that there was no proof of physical injury and thus no basis for an award of damages for intentional infliction of emotional distress, was addressed in Part I of this opinion. Curtis also asserts that there was no proof of conduct which was sufficiently outrageous to support a verdict for intentional infliction of emotional distress. In ruling upon Curtis' motion, the trial court reviewed the standards set forth in *Quick,* and stated:

> Using the above rules, the Court finds that there was substantial evidence upon which the jury could have arrived at it's verdict. Accordingly, the Court finds no basis for judgment N.O.V. in this case.

We previously listed the elements of a cause of action for intentional infliction of emotional distress. The Court of Appeals has noted that "[l]iability, however, only results when these reactions are so severe that no reasonable person could be expected to endure it." *Davis v. Gage,* 106 Idaho 735, 741, 682 P.2d 1282, 1288 (Ct.App.1984).

At the risk of subjecting the parties to additional public scrutiny of their private lives, it is necessary to recount some of the testimony which relates to this issue. Several witnesses attested to Firth's conservative attitudes regarding sex and substance abuse prior to her relationship with Curtis. They further testified that she was very family oriented, and even took her younger brother in and raised him after their mother died. She was portrayed as a kind, good-hearted, hard-working woman who would do anything for family or friends. After she quit her job and moved in with Curtis, witnesses told of her continuing

efforts to try and please him. She learned to cook the way he liked, she organized parties for his friends, she decorated the new house he built and worried about spending too much money on household expenses.

Firth also testified at length about the efforts she made to get along with Curtis. Despite those efforts, Curtis was an almost constant source of criticism. He complained that his socks were not in the drawer, his shirts were not cleaned, his bathroom sink was not cleaned, the tags were not clipped off his shirts, his food was poorly prepared and that Firth spent too much money. All of these criticisms might pass as the trials of every day life between two cohabiting people, for which Curtis argues we should expect tolerance. *See, e.g., Whelan v. Whelan*, 41 Conn.Supp. 519, 588 A.2d 251 (1991); *Hakkila v. Hakkila*, 112 N.M. 172, 812 P.2d 1320 (1991). There was more to this relationship, though, than might be expected as part of daily existence.

The testimony of Firth and Dr. Walker reflected a relationship between the parties which became progressively more depraved. While Curtis' sexual appetite was known to Firth from the beginning of their relationship, the type of sexual practices in which he chose to engage changed over time. Even though she was sickened at the nature of his activities, Firth chose to drug herself and participate in an effort to please and get along with Curtis. She testified to being videotaped during sexual activities, being forced to engage in sexual acts which she found repugnant and to being sexually assaulted.

There was also extensive testimony about mental abuse which Curtis inflicted on Firth. She and several witnesses testified that on numerous occasions Curtis would publicly and loudly scream at Firth if she displeased him. On some occasions she could identify the conduct which displeased him, such as Curtis not liking her cooking; but frequently she had no idea what made him angry or when he might start using profanities toward her. She also identified incidents where Curtis physically shook her so hard she feared she would fall off a boat dock, placed his foot in her back and kicked her out of bed, slapped her on the buttocks hard enough to leave a hand print, and pulled her hair as he threw her against the sink. Dr. Walker testified, without objection, to these incidents as well as to Curtis' anally raping Firth.

These incidents were sufficient to lead Dr. Walker, a well known specialist in dealing with battered women, to diagnose Firth as suffering from Post Traumatic Stress Disorder. In so doing, she distinguished between a dysfunctional marriage relationship and an actual battering relationship. We find there was evidence to support the conclusion that these actions by Curtis went far beyond the acceptable trials and tribulations of daily life and into the area of severe, extreme and outrageous conduct. We believe there was sufficient evidence by which the jury could conclude that Curtis' conduct was beyond that which a reasonable person should be expected to tolerate or endure.

Curtis' defense to the allegations seems to be that Firth enjoyed these activities and was a willing participant. It is obvious from the testimony and jury verdict, that the jury chose not to believe him and instead chose to believe Firth. Curtis now asks us to second guess the jury and to place more weight on his testimony. This is not the standard for reviewing a trial court's ruling on a motion for judgment notwithstanding the verdict. Based upon the foregoing, we find that there was sufficient evidence upon which the jury could arrive at a verdict in favor of Firth and the trial court committed no error in so concluding.

**Motion for New Trial—Sufficiency of Evidence**

 The standard for the trial court in ruling on a motion for new trial where it is alleged that the evidence was insufficient to support the jury's verdict, is set forth in *Quick v. Crane:*

> It is well established that the trial judge may grant a new trial based on I.R.C.P. 59(a)(6) where, after he has weighed all the evidence, including his own determi-

nation of the credibility of the witnesses, he concludes that the verdict is not in accord with his assessment of the clear weight of the evidence. *Sheets v. Agro–West, Inc.*, 104 Idaho 880, 883, 664 P.2d 787, 790 (Ct.App.1983).

. . . .

On a motion for a new trial, the court has broad discretion. On a motion for directed verdict or judgment n.o.v., it has no discretion and must consider only the question of law whether there is sufficient evidence to raise a jury issue. *Id.* On a motion for a new trial the court weighs the evidence and the credibility of the witnesses.

. . . .

Thus, on a motion for a new trial under this rule, unlike a motion for a directed verdict or judgment n.o.v., the trial judge may set aside the verdict even though there is substantial evidence to support it.

111 Idaho at 766–67, 727 P.2d at 1194–95.

This Court has consistently recognized the trial court's important function in ruling on motions for a new trial and has upheld the trial court's ruling "unless the trial court has manifestly abused the wide discretion vested in it, or, as in *Meissner,* [*Meissner v. Smith,* 94 Idaho 563, 494 P.2d 567 (1972)] misconceived the law or, as suggested in *Blaine v. Byers,* [*Blaine v. Byers,* 91 Idaho 665, 429 P.2d 397 (1967)] unless the trial judge has applied a 'question of law' rule to a decision which must be made as question of fact." *Dinneen v. Finch,* 100 Idaho 620, 625, 603 P.2d 575, 580 (1979).

After correctly enunciating the standard set out in *Quick,* the trial court held that "[I]n this case the Court finds no basis for a new trial on the basis of insufficiency of evidence." As indicated previously with respect to the motion for judgment notwithstanding the verdict, this Court has carefully reviewed the transcript of the proceedings below and is of the opinion that the trial judge did not abuse his discretion in denying the motion for a new trial on the basis of insufficiency of the evidence.

**Motion for New Trial—Excessive Damages**

· ▮▮▮ Curtis also alleges that the trial court committed error in denying his motion for a new trial on the basis of excessive damages. In its memorandum decision the trial court held:

In this case there is no indication of a verdict influenced by passion or prejudice, nor is there great disparity in the amount of damages set out in the verdict and *what the Court might have found,* assuming the Court first found for the defendant. The evidence was conflicting throughout the trial and the position of both parties was placed before the jury. From the Court's point of observation the jury could as easily have come back with a verdict for the plaintiff.

However, it cannot be said that the jury's verdict was not supported by substantial evidence. The decision, whether by verdict of the jury or finding of fact by the Court, was dependent upon whose expert and whose evidence was believed. Reasonable men or women could differ as to which side was entitled to the verdict or to the Court's decision. The Court chooses to yield to the combined wisdom of the twelve jurors and hold that the judgment based upon the jury's verdict should stand.

Consequently, plaintiff's Motion for a New Trial will not be granted on the basis of excessive damages or insufficiency of evidence.

(Emphasis added.)

In ruling on a motion for new trial based upon excessive damages, the trial court must make certain findings which were set forth in *Dinneen:*

Where a motion for a new trial is premised on inadequate or excessive damages, the trial court *must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that

there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient. A trial court is not restricted to ruling a verdict inadequate or excessive "as a matter of law." *Blaine v. Byers, supra.* Additionally, the rule that a verdict will not be set aside when supported by substantial but conflicting evidence has no application to a trial court ruling upon a motion for a new trial. *Blaine, supra; Rosenberg v. Toetly,* 93 Idaho 135, 456 P.2d 779 (1969).

100 Idaho at 625–26, 603 P.2d at 580–81.

We do not believe that the trial judge adequately discussed the findings necessary to make a ruling on the excessiveness of the damages. His mention of the damages that he "might have found" does not give us any indication that he had a definite amount in mind when weighing the question of the damages. There is nothing in his written decision which indicates to us what evidence he weighed and compared in ruling against Curtis' motion for a new trial. "Where the reasons are neither obvious nor stated, the appellate court is left to speculate about the trial court's perception of the law and knowledge of the facts." *Sheets v. Agro–West, Inc.,* 104 Idaho 880, 888, 664 P.2d 787, 795 (Ct.App.1983); *see also Soria v. Sierra Pac. Airlines, Inc.,* 111 Idaho at 609, 726 P.2d at 721. In light of the fact that there was no proof presented of actual damages sustained by Firth as a result of the batteries, nor any testimony about expenses related to her mental distress, we find the jury's verdict awarding $50,000 for the battery and $225,000 for the intentional infliction of emotional distress to be somewhat suspect. It may very well be that the trial judge had very similar figures in mind in ruling on the motion, but the record does not reflect on what he may have based that. For that reason we believe that this portion of the motion for new trial should be remanded to the trial court for further findings.

These findings should address the question of the excessiveness of the punitive damages as well. In this regard we note the comments of the Court of Appeals in *Davis v. Gage,* 106 Idaho 735, 682 P.2d 1282 (Ct.App.1984):

> After *Cheney,* the amount of punitive damages is left largely up to the district court's discretion. *Boise Dodge [Inc. v. Clark,* 92 Idaho 902, 453 P.2d 551 (1969) ] indicated that no particular mathematical ratio is prescribed and that "the true basis for an award of one amount of punitive damages as opposed to another amount lies in an overall appraisal of the circumstances to the case." Some of the factors which go into a judge's decision on whether punitive damages are excessive include the wrongdoer's motives, the degree of calculation, and the extent of the wrongdoer's disregard of the rights of others. Any factor he does examine, however, should focus on advancing the policy of deterrence.

106 Idaho at 740, 682 P.2d at 1287 (citations omitted). With this in mind the trial court should review and provide further findings as to the amount of punitive damages the court deems appropriate.

**Motion for New Trial—Punitive Damages**

While punitive damages are included in this Court's ruling on the motion for new trial based on excessive damages, there is an additional issue relating exclusively to the punitive damages which should be resolved at this time.

Curtis contends that the punitive damages awarded in this case were excessive and duplicated the damages awarded for intentional infliction of emotional distress. In *Linscott v. Rainier Nat. Life Ins. Co.,* 100 Idaho 854, 606 P.2d 958 (1980), the Court discussed the rationale behind punitive damages and noted:

> Punitive or exemplary damages are a peculiarity in the law of damages. Unlike other damages awards, their purpose is not to compensate the plaintiff, but to express the outrage of society at certain actions of the defendant. As such, they act as punishment, and serve to deter the defendant, and others in a similar position, from engaging in like conduct in the future. In Idaho the punishment rationale is disfavored. As this court said in a recent case:
>
> > "[W]e feel that the courts in these civil cases should be motivated primari-

ly by a purpose of deterrence and not a purpose of punishment. In other words, the assessment of exemplary damages should be prompted by the court's or jury's desire to assure, to the extent possible via the imposition of a monetary penalty, that similar conduct does not occur in the future. Punishment per se should be left to the criminal law."

100 Idaho at 857, 606 P.2d at 961 (citations omitted). Accordingly, an award of punitive damages serves the dual function of deterrence and expressing society's outrage. In contrast, compensatory damages are defined as damages that "will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury." *Black's Law Dictionary* 352 (5th ed. 1983).

As has been noted earlier in this decision, physical injury is not a required element for a cause of action for intentional infliction of emotional distress. Instead, the courts have limited the possibility of fraudulent claims by insisting that there be proof of outrageous intentional conduct which leads to severe emotional distress. *Rasmuson v. Walker Bank & Trust Co.*, 102 Idaho 95, 101, 625 P.2d 1098, 1104 (1981). Given the elements which must be proven to sustain a cause of action for intentional infliction of emotional distress, there may certainly be an overlap in the proof necessary for the compensatory damages for the tort and for punitive damages; e.g., extreme and outrageous conduct and conduct which causes severe emotional distress. "[T]here is no significant, if in fact any, difference between conduct by a defendant which may be seen to justify an award of punitive damages, and conduct which may justify an award of damages for emotional distress." *Brown v. Fritz*, 108 Idaho 357, 362, 699 P.2d 1371, 1376 (1985).

■ We do not view that as dispositive of the question of whether a punitive damage award is proper. The purposes which may make a punitive damage award appropriate are not satisfied by an award of purely compensatory damages. The Court of Appeals has held that "[p]unitive damages are not to take the place of future compensatory damages." *Davis v. Gage*, 106 Idaho 735, 740, 682 P.2d 1282, 1287 (Ct.App.1984). Thus we hold today that even though there may be identical proof presented in support of both punitive damages and a compensatory award for intentional infliction of emotional distress, the jury may still award damages for both. Appellant has not directed us to anything in the record to support his contention that the jury's award in this case was "duplicitous," nor have we found any such support in the record. The jury's verdict is support by substantial and competent evidence and should not be overturned.

## IV.

### CROSS–APPEAL

■ In a cross-appeal Firth asserts the trial court erred in granting summary judgment in favor of Curtis with regard to his action on a note executed by her. The facts surrounding this issue are not in dispute. In 1983, Firth executed a promissory note in favor of Curtis in the amount of $31,726.98 plus interest which was secured by a second deed of trust on a condominium owned by her. In April, 1989, Fort Worth Mortgage Corporation, which held the first deed of trust, declared a default and caused a trustee's sale to be held. Curtis purchased the condominium at the sale for $24,214.94 and subsequently received a trustee's deed for the property. At the time of the sale, the condominium had a fair market value of at least $45,000. In May, 1989, Curtis declared Firth's note in default and amended his complaint to bring an action on the note. The trial court granted summary judgment in favor of Curtis on this issue.

It is well established that a motion for summary judgment is to "be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." I.R.C.P. 56(c); *McCoy v. Lyons*, 120 Idaho 765, 820 P.2d 360 (1991); *G & M Farms v. Funk Irrigation Co.*, 119

Idaho 514, 808 P.2d 851 (1991); *Brown v. Matthews Mortuary, Inc.*, 118 Idaho 830, 801 P.2d 37 (1990). Furthermore, when determining whether a motion for summary judgment should be granted, all disputed facts are to be liberally construed in favor of the non-moving party, and all reasonable inferences which can be made from the record shall be made in favor of the party resisting the motion. *McCoy*, 120 Idaho at 769, 820 P.2d at 364.

When considering an appeal from a motion for summary judgment, our standard of review is the same as the standard used by the trial court in passing on the motion. *McDonald v. Paine*, 119 Idaho 725, 810 P.2d 259 (1991); *Meridian Bowling Lanes v. Meridian Athletic Ass'n, Inc.*, 105 Idaho 509, 670 P.2d 1294 (1983). Accordingly, on appeal we are required to apply these rules to the record before us and determine whether Curtis was entitled to judgment as a matter of law. In making this determination, we are required to review and consider the totality of the motions, affidavits, depositions, pleadings and attached exhibits contained in the record. *Anderson v. City of Pocatello*, 112 Idaho 176, 731 P.2d 171 (1986).

The record demonstrates that in ruling in favor of Curtis, the trial court relied upon *Frazier v. Neilsen & Co.*, 115 Idaho 739, 769 P.2d 1111 (1989) (*Frazier I*), and *Tanner v. Shearmire*, 115 Idaho 1060, 772 P.2d 267 (Ct.App.1989). In *Frazier I*, the Court interpreted I.C. § 45–1503 (prior to its 1989 amendment) as allowing a creditor who was the beneficiary of a trust deed securing the debt to elect one of three remedies upon default: 1) foreclosure by advertisement and sale; 2) foreclosure as a mortgage; or 3) bringing an action on the debt, itself, independent of any foreclosure.

In *Tanner*, the Court of Appeals followed our decision in *Frazier I*, but indicated in a footnote that the legislature was contemplating statutory changes which would overrule that decision. They opined, however, that any amendments which might limit the circumstances in which a beneficiary could ignore the security and

sue on the debt, would only apply to *instruments executed* after the effective date of the amendments. In relying on *Frazier I* and *Tanner*, the trial court apparently concluded that the 1989 amendments did not apply to Curtis' action, even though the action was brought after the effective date of the amendments to Section 45–1503.

Following the trial court's ruling, the Court of Appeals in *Frazier v. Neilsen & Co.*, 118 Idaho 104, 794 P.2d 1160 (Ct.App. 1990) (*Frazier II*), appeared to narrow the application of the 1989 amendment to I.C. § 45–1503, as enunciated in *Frazier I*, to only *"proceedings initiated* upon or after April 5, 1989...." 118 Idaho at 106, 794 P.2d at 1162 (emphasis added). It is important to note, however, that this holding is merely dicta. In *Frazier II*, the instrument was executed and the proceeding was initiated prior to the amendment of I.C. § 45–1503. Thus, any discussion about cases filed after the effective date of the amendment to the statute was unnecessary to the holding. Moreover, the dicta quoted above is contrary to *Steward v. Nelson*, 54 Idaho 437, 32 P.2d 843 (1934).

In *Steward*, the Court discussed the application of amendments to the mortgage statutes as they related to notes and mortgages already in effect. The Court noted that "[i]t is well settled that the law existing when a mortgage is made enters into and becomes a part of the contract." 54 Idaho at 441, 32 P.2d at 845. Further, a law which in its operation denies or obstructs any rights accruing under a contract is a violation of Idaho's constitutional provision prohibiting any laws which impair the "obligation of contract." *Id.* at 444, 32 P.2d at 846.

Based on the holding of *Steward*, we agree with the trial court in the instant case that the amendment to I.C. § 45–1503 does not apply to Firth's note. Consequently, we hold that Curtis was entitled to bring the action on the note without first resorting to the security required by I.C. § 45–1503(1)(c), as amended.[1]

---

1. As amended, I.C. § 45–1503 provides in pertinent part:

Firth also asserts that she should be entitled to an offset or credit for the amount by which the fair market value of the real property exceeded the amount Curtis paid at the foreclosure sale. She cites several Idaho cases involving mortgage foreclosures in support of this argument. We find those cases to be inapposite and unpersuasive in this particular case.

The trial court's order granting summary judgment in favor of Curtis' action on the note is affirmed. Based upon the foregoing, Firth is not entitled to attorney fees on her cross-appeal.

## V.

## CONCLUSION

The decision of the trial court is vacated as to the motion for new trial on the issues of excessive damages, and is remanded for further findings consistent with this opinion. The trial court's decision is affirmed in all other respects. No costs or fees to either party.

JOHNSON, J., concurs.

BISTLINE, Justice, dissenting in small part, and specially concurring.

Judge May, in authoring his written memorandum decision, had the benefit of having presided throughout the length of the trial, and thereafter on the post-judgment motions. In that regard he was as well positioned as is any trial judge relative to the verdicts returned by the jurors. As with most trial judges of equal experience, Judge May was well aware that the jury would have the opportunity to deliberate and return verdicts which it collectively believed to be just. Likewise, those verdicts might very well be for substantial amounts of compensation. Accordingly, Judge May, or any district judge presiding over a trial of issues such as here presented, is well aware that when the jury function is completed, there will ensue the motions of dissatisfied litigants seeking appropriate relief, most prominent of which will be the claim of an award of excessive damages or of inadequate damages. Did Judge May have this in mind as he presided over the jury trial? Of course he did.

Where I definitely differ from the majority opinion is this paragraph:

We do not believe that the trial judge adequately discussed the findings necessary to make a ruling on the excessiveness of the damages. His mention of the damages that he 'might have found' does not give us any indication that he had a definite amount in mind when weighing the question of the damages. There is nothing in his written decision which indicates to us what evidence he weighed and compared in ruling against Curtis' motion for a new trial.

Op., 123 Idaho 598, 608, 850 P.2d 749, 759.

---

If any obligation secured by a trust deed is breached, the beneficiary may not institute a judicial action against the grantor or his successor in interest unless:

a) The trust deed has been foreclosed by advertisement and sale in the manner provided in this chapter and the judicial action is brought pursuant to section 45–1512, Idaho Code; or

b) The action is one for foreclosure as provided by law for the foreclosure of mortgages on real property; or

c) The beneficiary's interest in the property covered by the trust deed is substantially valueless as defined in subsection (2) of this section, in which case the beneficiary may bring an action against the grantor or his successor in interest to enforce the obligation owned by grantor or his successor in interest without first resorting to the security.

(2) As used in this section, "substantially valueless" means that the beneficiary's interest in the property covered by the trust deed has become valueless through no fault of the beneficiary, or that the beneficiary's interest in such property has little or no practical value to the beneficiary after taking into account factors such as the nature and extent of the estate in real property which was transferred in trust; the existence of senior liens against the property; the cost to the beneficiary of satisfying or making current payments on senior liens; the time and expenses of marketing the property covered by the deed of trust; the existence of liabilities in connection with property for clean up of hazardous substances, pollutants or contaminants; and such other factors as the court may deem relevant in determining the practical value to the beneficiary of the beneficiary's interest in the real property covered by the trust deed.

Although not divulged in the courtroom during the course of trial, a trial court is very much concerned with considerations as to the damage amount it conceives to likely be justly and properly awarded by the jury. This Court's opinion in *Dinneen v. Finch* and then in *Quick v. Crane*[2] alerted the trial bench to the ever present likelihood that in damage actions it could be called upon to rule on post-trial motions for the grant of a new trial or judgment n.o.v. Moreover, the jury consisting of twelve minds is simultaneously going through the same process. Such being the actual state of affairs, *i.e.*, the jurors arriving at a damages amount, and returning their verdict, it would be an unusual district court that did not perceive at that time how closely, or disparately, its view as to damage awards coincided with the views of the jurors. No speculation is required. The court will have well in mind what it believes to be a fair and sustainable award, and, when the jury is in, the trial court is the one who determines the degree of disparity between its own assessment of damages as compared to that of the jury.

As the majority opinion here suggests, "It may very well be that the trial judge had very similar figures in mind in ruling on the motion [for a new trial], but the record does not reflect on what he may have based that." Better reasoning, so it seems to me, is that the trial judge was relieved to observe that the jurors had presented him with damage amounts that already were within the range of figures in his mind.

The jury in this case returned a verdict for $275,000 for general damages. Of that amount $50,000 was to compensate Sandra Firth for the batterings dealt her by Carl Curtis over a considerable period of time, which conduct ceased only after Curtis had evicted her from the residence both had occupied for some time; $225,000 was assessed against Carl Curtis for his conduct consisting of an intentional infliction of severe emotional distress. The jury, in addition to those compensatory damages, as-

sessed the amount of $725,000 in punitive damages. As pointed out in the majority opinion, at trial the jurors in the box had heard extensive expert testimony relative to the battered wife syndrome and also post-traumatic stress disorder.

As to the exemplary damages, basically there is no reason for not indulging in the same reasoning as with compensatory damages. During the past fifteen and more years, the trial courts have ably reached reasonable conclusions; seldom has it been necessary for an appellate court to question the ability of the trial courts and district courts to do the necessary sifting.

Other than for the foregoing observations, I fully concur in the majority opinion and add only the following to support its holding. I agree with Justice Trout's conclusion to utilize the Corpus Juris Secundum definition of a "continuing tort" and emphatically agree that it is here applicable. Clearly the conduct of Mr. Curtis was a continuing course of conduct which for the greater part was wrongful, but in minuscule part was not wrongful. In totality it appears that Curtis diabolically kept Firth off-balance by alternating between treatment which was kind and treatment which was scurrilous.

I also agree with the definition of a continuing tort theory, which Justice Trout found in *Page v. United States*, and mention also that footnote 36 at 729 F.2d 823, provides a glossary of other cases which recognize a *tolling* doctrine of continuous treatment. This doctrine was first enunciated in *Borgia v. City of New York*, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962). Another case in the federal judicial system which factually bears much similarity to *Curtis v. Firth* is *Landman v. Royster*, 354 F.Supp. 1302 (E.D.Va.1973). Language in that case which is readily applicable to the conduct of Curtis includes such terms as "phobic injuries; traumatic neurosis; psychic injuries; deliberate efforts to dehumanize; six years of arbi-

2. *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979); *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986).

trary, illegal and unjust treatment calculated to dehumanize; resultant need of psychiatric care and expenses thereof."

The United States District Court, Judge Merhige, observed in *Landman*, that:

Both counsel [for plaintiff and defendant] have adduced expert psychiatric testimony in an effort to show the adverse effects, or lack of them, that may have flowed from continual solitary or isolated confinement. The substance of the testimony is neither contradictory nor surprising: even a lay person could be expected to fairly deduce that the repetitive pattern of treatment to which Landman was subjected would have adverse psychological effects. Nevertheless, a discussion of that testimony is warranted.

Plaintiffs' expert, Dr. Abse, is a psychiatrist with extensive experience in treating released prisoners of war. Specifically, he did much work with British soldiers released after World War II from Japanese prisoner of war camps and has since studied effects of isolated confinement upon civilian prisoners. Based upon his experience, he was able to generalize several typical patterns of reactive behavior, which patterns he labeled as symptomatic of 'Traumatic Neuroses.' The underlying cause of said behavior, he stated, was repression of emotions caused by isolation, fear and frustration. Symptoms associated with this type of neurosis include anxiety, destructiveness, easy fatigability, diminished sexual potency, as well as psychosomatic illness (including gastric disorders, choking, headaches and backaches).

Dr. Abse personally examined Landman and concluded thereupon that he possessed these symptoms. He ascribed to Landman's travails severe physical and phobic injuries which evidenced themselves in the form of traumatic neuroses. While Dr. Abse stated that Landman undoubtedly had neurotic symptoms prior to incarceration, his incarceration at the Virginia State Penitentiary exacerbated his illness when in fact proper rehabilitation, including psychiatric care, might have cured it. Dr. Abse added

that the effects of solitary confinement were aggravated by the diet which was given Landman during those times, i.e., recurring cycles of bread and water for two days, reduced meals a third day.

Interestingly enough, he concluded that solitary confinement beyond a two or three week period would have definite adverse effect upon most people.

*Landman*, 354 F.Supp. at 1307. Having also heard the testimony of defendant's expert, Dr. Tice, the court placed it of record in the written opinion:

Defendants' expert, Dr. Tice, was also eminently qualified. He did not personally examine Landman, but did conclude on the basis of observation of the maximum security and solitary cells that adverse effects caused by confinement therein depended on the relative degree of isolation from human contact in which the prisoners were held. He did admit, however, that such conditions as Landman was subjected to could have deleterious effects. While he did differ with Dr. Abse on the exact definition of Traumatic Neurosis, he did not in any way specifically contradict Dr. Abse's medical findings or conclusions. Accordingly, *the Court finds as fact that Landman was caused to suffer severe psychic and physical injuries* by virtue of the constitutional deprivations to which he was subjected.

*Landman*, 354 F.Supp. at 1307 (emphasis added).

Judge Merhige concluded that the ultimate person in charge of prison operations was W.H. Cunningham, whose title was Director of the Division of Corrections:

The Court is fully satisfied, despite Cunningham's denials to the *contra*, that Landman was indeed treated under direct authority of Cunningham. His constant assertion of legal rights obviously resulted in what Cunningham and other prison administrators considered to be creative of a bad image for the institution. The Court is more than satisfied from the evidence that *deliberate efforts* under direction of Cunningham were *made to de-humanize Landman.*

. . . .

The testimony of Dr. Abse has shown that *Landman's psychic disorders resulted from a* **continual pattern** *of [mis]treatment.*

. . . .

With respect to the statute of limitations question, the court has found that *Landman was subjected to a continual pattern* of unconstitutional punishment, the *damages for which arise from the cumulative impact* of his isolated confinement *rather than from individual episodes* thereof. The continuous nature of this *subjugation* after March 1965 brings Landman *within the well settled exception of the law of limitations,* to-wit: *when injury is caused cumulatively by a continuing wrong, the statute of limitations begins to run when the wrongful action ceases.* See *Baker v. F. & F. Investment et al.,* 420 F.2d 1191 (7th Cir.1970).

The traumatic neurosis suffered by Landman results *not* from individualized instances of tortious behavior, but *from the continued frustration of six years of arbitrary, illegal and unjust treatment. . . .* treatment calculated to *dehumanize* the man. Indeed, every illegal incident visited upon Landman simply accentuated and aggravated his condition existing immediately prior thereto.

*Landman,* 354 F.Supp. at 1313–15 (emphasis in original and supplied).

A GLOSSARY OF APPLICABLE TERMS

From Roget's II The New Thesaurus (1984):

*Degradation*—Degrade. To debase, to demote, to humble.

*Debase*—To cheapen, to degrade, to demean.

From Webster's New Riverside University Dictionary (1988):

*Dehumanize*—To deprive of human qualities or attributes.

*Dominate*—To control; to rule by superior power; to control or rule by authority.

*Subjugate*—To bring a person(s) under the dominion of another; enslave.

*Surveillance*—Close observation; the state of observing.

*Subordinate state*—In a position of subordination; subservient.

BAKES, Justice, Pro Tem., concurring in part and dissenting in part:

I concur in that portion of the Court's opinion which vacates the trial court's decision regarding the motion for new trial on the issue of excessive damages and remands for further findings on that motion. I also concur in the result of Part IV relating to the cross appeal. However, I cannot agree with that portion of the Court's opinion which holds that Curtis was not entitled to a jury instruction on the statute of limitations.

First, the Court's opinion does not even discuss Firth's claim for damages for battery, and whether Curtis was entitled to a statute of limitations instruction on that claim. The jury awarded $50,000 on the battery claim. By the Court's own analysis, there was a triable issue of fact over whether or not the statute of limitations had run on Firth's several claims of battery—for example, the 1979 or 1980 incident referred to by the Court where Curtis allegedly "physically shook her so hard she feared she would fall off the boat dock." *Ante* 123 Idaho at 606, 850 P.2d at 757. The majority opinion acknowledges that for purposes of the statute of limitations, "It is important to distinguish between separate acts which may be assault, defamation, or battery, and a continuing course of wrongful conduct which constitutes intentional infliction of emotional distress." *Ante* at 603, 850 P.2d at 754. Thus, Curtis's statute of limitations defense as to Firth's battery claims must be analyzed separately from his statute of limitations defense to the intentional infliction of emotional distress claim. The physical shaking and other types of battery, such as kicking her out of bed, slapping her on the buttocks so hard as to leave a hand print, and pulling hair and throwing against the sink were batteries separated not just by weeks or months, but in some instances by years. Thus, viewing the evidence most favorably toward Curtis, as the Court's opinion ac-

knowledges we must do in determining whether or not he was entitled to a statute of limitations instruction on Firth's separate battery claim, there was a triable issue of fact over whether all, or at least part of Firth's claim for battery was barred by the statute of limitations. The trial court erred in not giving such an instruction.

However, my main concern is with the Court's action in adopting a "continuing tort" exception to the statute of limitations with regard to the tort of intentional infliction of emotional distress. The Court analyzes the issue as though we were dealing with a common law rule, rather than with a statute enacted by the Idaho legislature. Without discussing the plain wording of the statute, the Court employs a "continuing tort" analysis, creating yet another judicial exception to I.C. § 5–219(4), which unfortunately has had a long and troubled relationship with this Court. The Court's opinion not only directly conflicts with the clear legislative intent expressed in I.C. § 5–219(4), but it also conflicts with the Court's recent reaffirmance of the ten year old "some damage" rule, which was itself a judicial exception engrafted onto I.C. § 5–219(4). *See Chicoine v. Bignall,* 122 Idaho 482, 835 P.2d 1293 (1992).

This Court has repeatedly said that when the legislature enacts or amends a statute the paramount rule of statutory construction is to give effect to the legislature's intent and purpose. *In the Matter of: The Tax Appeal of Roman Catholic Diocese,* 123 Idaho 425, 849 P.2d 98 (1993); *Sweitzer v. Dean,* 118 Idaho 568, 798 P.2d 27 (1990). To ascertain the legislative purpose of the 1971 amendment to I.C. § 5–219(4), it is necessary to review two cases which prompted the 1971 amendment and the statute's present language. The first case was *Billings v. Sisters of Mercy of Idaho,* 86 Idaho 485, 389 P.2d 224 (1964), which addressed the issue of the point in time at which a cause of action accrues when a foreign object has been left in a patient's body by a surgeon. In apparent dissatisfaction with the case law interpreting the pre–1971 version of I.C. § 5–219, which had held that such a cause of action accrued at the time of the act complained of—in *Bill-*

*ings* when the sponge was left in the patient—the *Billings* Court created a discovery exception to the statute. The *Billings* Court considered a continuing tort analysis, apparently rejecting it in favor of a so-called "discovery exception," holding that the cause of action did not accrue until the patient discovered, or through reasonable diligence should have discovered, the presence of the foreign object.

Following the *Billings* case the Court, in *Renner v. Edwards,* 93 Idaho 836, 475 P.2d 530 (1970), expanded the discovery exception to include medical malpractice cases involving misdiagnosis. The Court justified the extension because "[o]ur legislature did not define the time of accrual as being either the time of the performance of the negligent act or the time of the acquisition of knowledge of the negligent act." 93 Idaho at 840, 475 P.2d 530. In the absence of such a legislatively defined time of accrual, the Court apparently felt free to extend the discovery rule to medical misdiagnosis cases.

It was in response to *Renner* and its reference to the fact that the "legislature did not define the time of accrual," that the legislature amended I.C. § 5–219(4) in 1971 to specifically state that, except in cases involving "damages arising out of the placement ... of any foreign object in the body of any person," or when the damage has been "fraudulently and knowingly concealed from the injured party," *"in all other actions,* whether arising from professional malpractice or otherwise, *the cause of action shall be deemed to have accrued as of the time of the occurrence, act or omission complained of,* and the limitation period shall not be extended by reason of any continuing professional or commercial relationship between the injured party and the alleged wrongdoer...." (Emphasis added.) *See Chicoine v. Bignall,* 122 Idaho 482, 835 P.2d 1293 (1992), for a historical analysis of I.C. § 5–219(4). In *Streib v. Veigel,* 109 Idaho 174, 706 P.2d 63 (1985), we recognized that I.C. § 5–219(4) "is not restricted to professional malpractice, but appears to govern

all actions for personal injuries." 109 Idaho at 175, 706 P.2d 63.

It is clear from reading the statute that the legislature intended to preserve the pre-*Billings* interpretation of I.C. § 5–219, subject only to two delineated exceptions, those being the foreign object and fraudulent concealment exceptions.[3] The pre-*Billings* interpretation of I.C. § 5–219, as it might relate to so-called "continuing torts," was contained in this Court's decision in *Woodland v. Lyon*, 78 Idaho 79, 298 P.2d 380 (1956), which applied the statute of limitations to continuing torts. It is also apparent that the legislature explicitly rejected the majority's continuing negligence concept, which the Court considered and rejected in *Billings, supra*, by enacting that part of I.C. § 5–219(4) which states that "the limitation period shall not be extended by reason of any continuing consequences or damages resulting therefrom or any continuing professional or commercial relationship between the injured party and the alleged wrongdoer...." The Court of Appeals has so held in *Pichon v. Benjamin*, 108 Idaho 852, 854, 702 P.2d 890, 892 (Ct.App.1985) ("We believe that, by amendment of I.C. § 5–219, our legislature has expressly rejected the theory of continuing negligence advocated by Pichon.") *See George W. Watkins Family v. Messenger*, 118 Idaho 537, 797 P.2d 1385 (1990) (it is assumed that when the legislature enacts or amends a statute, it has full knowledge of existing judicial decisions and case law of the state); *Local 1494 of Intern. Ass'n of Firefighters v. City of Coeur d'Alene*, 99 Idaho 630, 586 P.2d 1346 (1978) (where a statute specifies certain things, the designation of such things excludes all others).

The majority's "continuing negligence" theory is directly contrary to the express provisions of I.C. § 5–219(4).

Not only does the continuing tort concept, adopted today, disregard the language of I.C. § 5–219(4), but it is also inconsistent with the "some damage" exception which this Court for ten years has applied in construing I.C. § 5–219(4). *Stephens v. Stearns*, 106 Idaho 249, 678 P.2d 41 (1984); *Streib v. Veigel*, 109 Idaho 174, 706 P.2d 63 (1985); *Chicoine v. Bignall*, 122 Idaho 482, 835 P.2d 1293 (1992). *See also Griggs v. Nash*, 116 Idaho 228, 775 P.2d 120 (1989); *Hawley v. Green*, 117 Idaho 498, 788 P.2d 1321 (1990); *Bonz v. Sudweeks*, 119 Idaho 539, 808 P.2d 876 (1991). Under the "some damage" exception, a cause of action does not accrue until some damage to the plaintiff occurs. But when "some damage" occurs, the statute begins to run. *Griggs v. Nash, supra* (incurring attorney fees constitutes "some damage," triggering the running of the statute of limitations). The Court just recently reaffirmed the "some damage" rule in *Chicoine v. Bignall, supra.*

The rationale behind the "some damage" rule was that until "some damage" occurred the plaintiff had nothing to sue for. *See Stephens v. Stearns, supra.* However, once "some damage" exists, the tort exists, the cause of action accrues and the statute of limitations begins to run. *Griggs v. Nash, supra.* We have applied the "some damage" rule even when the negligence was considered to be continuing in nature. *See Streib v. Veigel, supra.* As the Court itself quotes from the *Streib* case, *ante* at 603, 850 P.2d at 754. "We hold that the tortious negligence is continu-

---

**3.** The Statement of Purpose for House Bill No. 93, the bill amending I.C. § 5–219(4), confirms what the statute made explicit:

This bill presumes that there should be some point in time when matters may be put behind. *It goes on the premise that the common law rule of hundreds of years' standing is correct* except for foreign object cases in medical malpractice where the claimant should have a reasonable time after he knows or should know that the object has been left in his body; also, except for a professional malpractice claim of any kind wherein the person providing service has deliberately concealed

facts to keep his customer or patient from knowing that he may have a claim. In these exceptional cases equity requires, and this bill permits late filing. *Otherwise, this bill requires diligent and timely prosecution of claims and would re-establish the basic policy of the common law which opposes stale claims and favors a definite cut-off date after which a person need not fear that he will be sued for things that happened in the past; in this case, over two years ago.*

Statement of Purpose, H.B. 93 (1971) (emphasis added).

ing in nature *until the plaintiffs suffer damage."* 109 Idaho at 179, 706 P.2d at 68 (emphasis added). Thus, under *Streib*, even if the negligence is continuing, when "some damage" occurs, the statute of limitations begins to run. We have further held that continuing damages does not toll the statute of limitations. *Ralph's v. City of Spirit Lake*, 98 Idaho 225, 227, 560 P.2d 1315, 1317 (1977) ("[T]he applicable statute begins to run from the occurrence of the wrongful act albeit the full extent of the damages may be unknown...."). The Court's "continuing tort" theory today is contrary to the "some damage" rule.

It is clear from the plaintiff's own evidence in this case that Firth suffered "some damage" as early as 1978. The plaintiff was permitted by the trial court to argue to the jury, and did argue to the jury that the plaintiff should be compensated for damages for the years from 1978 through 1988, both for the battery incidents and for the continuing intentional infliction of emotional distress. Applying the principles of the "some damage" rule to the facts of this case, Firth's cause of action for battery accrued as each separate battery incident occurred, such as the shaking on the boat dock incident.

Firth's cause of action for intentional infliction of emotional distress accrued at the point in time during her relation with Curtis when all of the elements of the tort of intentional infliction of emotional distress were present. These elements include: (1) intentional or reckless conduct; (2) which is extreme and outrageous; (3) which is causally related to the emotional distress; and (4) severe emotional distress. *See Evans v. Twin Falls County*, 118 Idaho 210, 796 P.2d 87 (1990). We have further stated that, "Justification for an award of damages for emotional distress seems to lie not in whether emotional distress was actually suffered by a plaintiff, but rather in the quantum of outrageousness of the defendant's conduct." *Brown v. Fritz*, 108 Idaho 357, 362, 699 P.2d 1371, 1376 (1985). The anal rapes, sexual assaults and other gross indignities which commenced in 1982 were certainly sufficiently "outrageous" to commence the run-

ning of the statute of limitations on any damages from that conduct. *Brown v. Fritz*, 108 Idaho 357, 699 P.2d 1371 (1985); *See also, Chicoine v. Bignall*, 122 Idaho 482, 835 P.2d 1293 (1992); *Griggs v. Nash*, 116 Idaho 228, 775 P.2d 120 (1989); *Streib v. Veigel*, 109 Idaho 174, 706 P.2d 63 (1985); *Stephens v. Stearns*, 106 Idaho 249, 678 P.2d 41 (1984); *Woodland v. Lyon,* 78 Idaho 79, 298 P.2d 380 (1956). The plaintiff could certainly have sued the defendant at that time and survived a motion for directed verdict. *Brown v. Fritz, supra.*

A review of the trial testimony reveals that Firth sought to prove both her battery claim and her claim for intentional infliction of emotional distress by presenting to the jury various acts of abuse she endured from Curtis throughout their entire ten-year relationship from 1978 to 1988. The testimony came from Firth herself and from Dr. Walker, Firth's expert. Dr. Walker's testimony included a history of the entire ten-year relationship beginning with the physical battery and psychological abuse suffered by Firth in 1978 within six months after she began living with Curtis. Dr. Walker testified:

[T]he first abusive incident that she classified as a battering incident began about six months after.

Actually it's longer than that. There was a smaller incident about six months after. The first actual incident occurred in the spring of 1980, on a trip to Mexico. And at that time she described a very psychologically abusive incident.

Firth and Dr. Walker also testified to various acts of sexual abuse beginning in 1982, which the majority opinion correctly describes as sexual assault, anal rape, and various other acts which caused extreme emotional distress. Dr. Walker testified that in between the acts of abuse, the relationship between Curtis and Firth was a happy and loving one. However, over the years as the relationship progressed, the acts of abuse became more frequent and more severe, and the happiness in between became less prevalent and shorter. Firth testified that the first incident of physical and psychological abuse occurred

in 1979. She specifically identified various physical and psychological abusive treatment she received on a trip to Mexico with Curtis in 1980. She testified how the sexually abusive conduct commenced in 1982 and became more frequent as the years progressed.

The plaintiff's own testimony was the basis for Curtis's claim that the statute of limitations barred any claim for damages occurring more than two years prior to filing of Firth's complaint. The trial court's position throughout the trial was that as a matter of law the tort of intentional infliction of emotional distress was a "continuing tort," and so long as there was some tortious conduct within the two years of filing the complaint the statute of limitations simply didn't apply, and Firth could recover all damages for all acts occurring throughout the entire ten-year relationship. The trial court never discussed the battery claims separately.

This case does not involve the question of whether Firth's claims should be entirely barred. Rather, this case involves the issue of whether damages which were inflicted more than two years prior to commencement of the action in 1988 are barred by the statute of limitations. In closing argument, Firth's counsel was permitted to argue that damages were suffered during the entire ten years (1978–1988) of her relationship with Curtis. Given that there was evidence to support a finding by the jury that "some damage" existed prior to 1986, as Firth's counsel argued, the trial court should have instructed the jury that the statute of limitations precluded the award of damages for any of acts occurring prior to 1986. *Woodland v. Lyon*, 78 Idaho 79, 298 P.2d 380 (1956); *State v. Eastman*, 122 Idaho 87, 831 P.2d 555 (1992).

The majority's failure to apply the "some damage" rule is not explained. The Court relies on the case of *Farber v. State*, 102 Idaho 398, 630 P.2d 685 (1981), a federal case, and a statement from C.J.S., in holding that Curtis was not entitled to a jury instruction on the statute of limitations. However, *Farber* is not dispositive. *Farber* did not even involve a statute of limita-

tions. *Farber* involved the 120–day notice of tort claim provision of I.C. § 6–905. The Court in *Farber* expressly disavowed any application of the decision to either the statute of limitations or claims not based on contract. It is difficult to understand how the *Farber* case can support the Court's decision, based as it was on an entirely different statute.

The Court misconstrues, in my opinion, the case of *Woodland v. Lyon*, 78 Idaho 79, 298 P.2d 380 (1956), which to me seems to be directly in point. In the *Woodland* case, the defendant, an upstream water user on a creek, made an alteration in the stream bed on his own land which interfered with the flow of water to the fields of the downstream plaintiff who, as a result, sustained damage to crops during the irrigation seasons of 1950 through 1953. Plaintiff was awarded damages for pasture damage, loss of crops, and the estimated cost of restoring the stream bed to its original condition. The tort involved was the diversion of the plaintiff's water during each of the four years. The damages were the loss of crops and cost of removing the obstruction. The Court in *Woodland* stated, "The tort herein alleges not a single wrong, but a continuing one, and the appellant may, if the evidence supports his claim, recover for all injuries occurring *within the statutory period* [four years], even though the obstruction occurred more than four years before the complaint was filed." 78 Idaho at 83, 298 P.2d at 381 (emphasis added). The *Woodland* Court clearly held that, even with continuing torts, damages can only be recovered for "injuries occurring during the statutory period." The majority opinion's statement that the *Woodland* case does not involve a continuing tort, but only continuing damages, is an inaccurate analysis of the holding in that case. In my view, the *Woodland* case is directly in point, not the *Farber* case as applied by the Court today. However, in any event, the statute, I.C. § 5–219(4), controls since it is the most recent statement by the legislature as to when causes of action such as those involved in this case accrue.

Irrespective of whether the majority opinion is viewed as holding, as the trial court held, that I.C. § 5–219(4) simply does not apply to "continuing torts," or whether the majority opinion is construed as holding that with regard to "continuing torts" no cause of action arises "until those acts are completed," the statute of limitations in I.C. § 5–219(4) precludes that result. We are not here dealing with a common law rule. Furthermore, the Court's action today modifies and leaves in doubt the status of the "some damage" rule which this Court has now been following for ten years in interpreting the current version of I.C. § 5–219(4).[4]

This Court has recently stated with regard to the standard for statutory interpretation that:

> Under art. II, § 1, art. III, §§ 1 and 15, and art. V, §§ 2 and 13 of the Idaho Constitution, it is solely the province of the legislature to make laws and the duty of the court to construe them and, *if a law as construed by the court, is to be changed, that is a legislative not a judicial function.* [Citing cases.]

This Court has consistently adhered to the primary canon of statutory construction that where the language of the statute is unambiguous, the clear expressed intent of the legislature must be given effect and there is no occasion for construction.

*In the Matter: The Tax Appeal of Roman Catholic Diocese of Boise,* 123 Idaho 425, 849 P.2d 98 (1993) (emphasis added). For the last ten years, I.C. § 5–219(4) has been construed to mean that the statute of limitations begins to run when "some damage" occurs. "[I]f a law as construed by the court, is to be changed, that is a legislative not a judicial function." *In the Matter: The Tax Appeal of Roman Catholic Diocese of Boise, supra.*

I.C. § 5–219(4) is unambiguous and clearly states that the cause of action accrues at the time of the act or omission complained of, and that the limitation period shall not be extended by reason of any continuing damages or relationship. Today's decision is a clear departure from the statute and from ten years of cases interpreting that statute. I would reverse the judgment of the trial court.

Even though the judgment of the trial court should be reversed for failing to instruct the jury on the statute of limitations, both as to the battery claim and the claim for intentional infliction of emotional distress, a retrial would not be necessary on remand in this case.

This case was an equitable proceeding from the very beginning. Curtis commenced the proceeding by filing a complaint for a mandatory injunction on February 1, 1988, invoking the equity jurisdiction of the court. Four days later, on February

---

4. In addition to casting doubt on the status of the "some damage" rule, the Court's "continuing tort" theory could have a serious impact on other areas of the law, for example, easements by prescription. As we stated in *State ex rel. Haman v. Fox,* 100 Idaho 140, 146, 594 P.2d 1093, 1099 (1979), "Only those who have actually made open, notorious, *continuous,* uninterrupted use under a claim of right, with the knowledge of the owner, for the five year period" can acquire a prescriptive easement. (Emphasis added.) If such "continuous, uninterrupted use" occurs, the applicable statute of limitations, I.C. § 5–203, "gives an owner five years to take the necessary and appropriate legal action to have an unauthorized use of his property stopped. If the owner of the property fails to eject the trespasser or enjoin the unauthorized use, after five years his right to do so will be barred." *State ex rel. Haman v. Fox,* 100 Idaho at 146, 594 P.2d at 1099. However, under the majority's "continuing tort" theory, the land-

owner's cause of action would not accrue until the trespassing ceased, and if it never ceased apparently the landowner would have no cause of action—at least if the case of *Page v. United States, supra,* relied on by the majority, is followed. Furthermore, as to the person attempting to acquire the easement by prescriptive use, his "continuous, uninterrupted use" would constitute a continuing tort, and the statute of limitations would not commence running until such continuous and uninterrupted use stopped. The person would then have to wait out the five-year period. However, after waiting five years for the statute to run, the use would no longer be "continuous, uninterrupted use" and therefore a trespasser may never obtain an easement by prescription under the Court's "continuing tort" theory. There will no doubt be other areas of the law which will be adversely impacted by the Court's "continuing tort" theory announced today.

4, 1988, Firth filed a counterclaim for divorce, which is an equity proceeding, and joined with it her claims for battery and intentional infliction of emotional distress. Firth's tort claims for battery and intentional infliction of emotional distress were not mandatory counterclaims to Curtis's mandatory injunction proceeding, nor was it mandatory that Firth join her tort claims with her equitable divorce proceeding. This Court held in *Nash v. Overholser,* 114 Idaho 461, 757 P.2d 1180 (1988), that mandatory joinder of tort claims with equitable divorce proceedings is not required. The Court in *Nash* then quoted approvingly from the Wisconsin opinion in *Stuart v. Stuart,* 140 Wis.2d 455, 410 N.W.2d 632 (Ct.App.1987), holding that if a spouse was required to join tort claims with equitable divorce proceedings the spouse would "waive the right to a jury trial on the tort claim." 114 Idaho at 462, 757 P.2d at 1181. By voluntarily joining her legal tort claims of battery and intentional infliction of emotional distress in the equitable proceeding, Firth waived her right to a jury trial. "[E]quity having obtained jurisdiction of the subject matter of the dispute, will retain it for the settlement of all controversies between the parties with respect thereto...." *Boesiger v. Freer,* 85 Idaho 551, 563, 381 P.2d 802, 809 (1963). *Accord, Carpenter v. Double R Cattle Co., Inc.,* 108 Idaho 602, 701 P.2d 222 (1985); *Idaho First National Bank v. Bliss Valley Foods,* 121 Idaho 266, 824 P.2d 841 (1992); *Fogelstrom v. Murphy,* 70 Idaho 488, 222 P.2d 1080 (1950); *Dover Lumber Co. v. Case,* 31 Idaho 276, 284, 170 P. 108, 110 (1918) ("The fact that defendant sets up a legal defense to an equitable cause of action does not change the character of the

proceedings or entitle him to demand a jury trial...."). The only exception to the rule that once equity has obtained jurisdiction of the subject matter of a dispute it will settle all of the controversies between the parties with respect thereto relates to either compulsory counterclaims or claims which must mandatorily be joined. *Steed v. Young,* 115 Idaho 247, 766 P.2d 717 (1988).

The district court in this case first tried Firth's claim for divorce based on a common law marriage claim without using a jury, and made findings of fact and conclusions of law as required by I.R.C.P. 52. The district court concluded that the parties were never married, and therefore denied Firth's claim for a divorce.[5] As to Firth's remaining tort claims for battery and intentional infliction of emotional distress the trial court granted Firth a jury trial over Curtis's objection that Firth was not entitled to a jury trial, and that the trial court had the duty to make findings of fact under I.R.C.P. 52. The trial court denied Curtis's objection to the trial by jury and submitted the battery and intentional infliction tort claims to a jury and entered a judgment on the jury's verdict.[6]

However, this was an equitable proceeding commenced by Curtis with his suit for mandatory injunction, and was continued as an equitable proceeding by Firth with her claim for divorce. Firth's tort claims for battery and intentional infliction of emotional distress were not compulsory counterclaims, nor was she mandated to join them with her equitable proceeding for divorce. *Nash v. Overholser, supra.* By joining those tort claims with the equitable proceedings, Firth waived her right to a

**5.** As the Court's opinion notes, even though the trial court found that no marriage existed, and therefore no divorce could be granted, the court nevertheless ordered Curtis to pay significant financial support for "rehabilitative purposes," as well as Firth's attorney fees. While that issue was not raised or briefed on appeal by Curtis, I know of no authority for a court of equity to order financial support for rehabilitative purposes at the conclusion of a meretricious relationship, and there certainly is no statutory authority for the award of attorney fees under those circumstances. Our cases require specific

statutory authority for the award of attorney fees in civil actions. The trial court cited no authority for its action. That should be another factor for the trial court to consider on remand when considering the question of the excessiveness of damages for which the majority of the Court has remanded this action.

**6.** Curtis has not raised as an issue on appeal the trial court's allowing a jury trial and the failure of the court to make findings under I.R.C.P. 52. Therefore, the Court has not addressed that issue.

trial by jury, and the trial court should have denied Firth's request for a jury trial. The jury's verdict was at best only advisory. The trial court was required by I.R.C.P. 52 to make findings of fact and conclusions of law on Firth's two tort claims for battery and intentional infliction of emotional distress. *Idaho First National Bank v. Bliss Valley Foods, supra; Carpenter v. Double R Cattle Co., supra; Boesiger v. Freer, supra; Dover Lumber Co. v. Case, supra.*

Since this matter is being remanded to the trial court to make additional findings anyway, I believe the correct disposition of this case should be to require the trial court to make the findings of fact and conclusions of law required by I.R.C.P. 52 regarding whether or not the plaintiff has proved the torts of battery and intentional infliction of emotional distress. The trial court should be directed that the statute of limitations in I.C. § 5-219(4) applies, and that the defendant is not liable for any tortious conduct occurring prior to two years prior to the commencement of the action in 1988, nor is the defendant liable for any damages occurring prior to that time.

SWANSTROM, J. Pro Tem., concurs.