918 P.2d 271

**Angeles Torres JUAREZ, an individual and as mother and natural guardian ad litem of Alberto T. Juarez and Sandra T. Juarez, her minor children and as Administratrix of the Estate of Aldo J. Juarez, the decedent, Plaintiffs–Appellants,**

v.

**Frans and Cornelia AARDEMA, husband and wife, Thomas and Mary Jane Heida, husband and wife, individually and dba Aardema–Heida Dairy, an Idaho business entity; John Does I through V, Defendants–Respondents.**

No. 20918.

Supreme Court of Idaho,
Twin Falls, November 1995 Term.

June 7, 1996.

Ellsworth, May, Sudweeks, Stubbs, Ipsen & Perry, Twin Falls; Kenneth L. Pedersen, Twin Falls, for appellants. Bart D. Browning argued.

John A. Doerr, Twin Falls, for respondents.

SILAK, Justice.

This case involves a wrongful death action brought by the wife and children of a deceased dairy employee who died while working at the dairy. The principal issue presented in this appeal is whether the district court properly denied the appellants' motion for judgment n.o.v. or in the alternative a new trial. For the reasons stated below, we affirm that portion of the district court's order denying appellants' motion for judgment n.o.v., but vacate the portion of the order denying the motion for a new trial and remand the case for further proceedings consistent with this opinion.

# I.

## FACTS AND PROCEDURAL BACKGROUND

This appeal arises from the death of Aldo J. Juarez (Juarez) on the night of April 17, 1991, while he was working as the night foreman at the Aardema–Heida Dairy (the Dairy). Juarez was asphyxiated when a rapid-exit gate caught him across the neck and upper chest. Juarez was working alone on the night of the accident. The facts as developed at trial are summarized below.

Juarez had worked at the Dairy for approximately two years before he was killed. Juarez was a very good employee whom the Dairy manager had promoted to night foreman because Juarez was a hard worker who was always on time, had good attendance, was trustworthy and was safety conscious. On the night of the accident, Juarez's duties as night foreman included checking the barn and calving shed for problems, pushing feed up to the cows with a tractor, milking the cows, greasing the rapid-exit gates, cleaning the barns, bringing in the next milking shift's cows, and odd jobs such as replacing light bulbs. At the time of Juarez's accident, he appeared to have either just finished or was about to finish greasing the rapid-exit gates. The purpose of greasing these gates is so that they do not become "hung up" or stuck.

Juarez's body was discovered by a co-employee of the Dairy, Pablo Gonzalez, when he arrived at the Dairy for his milking shift on the night of April 17, 1991, at 11:30 p.m. As Pablo Gonzalez was leaving the barn to retrieve the cows for the next milking shift, he discovered Juarez caught in the last rapid-exit gate. Juarez was facing the exit alley (toward the outside), with his back to the gate switch that was located in the operator station. Pablo Gonzalez opened the rapid-exit gates to release Juarez, causing Juarez to fall to the ground, his body landing halfway inside the stall area and halfway inside the exit alley. Pablo Gonzalez observed that Juarez was wearing a greasy plastic glove that was customarily worn by employees when greasing the gates. Pablo Gonzalez testified that both of Juarez's hands had grease on them and that there was a grease

bucket in the exit alley about three yards away from where Juarez was found. Pablo Gonzalez stated that when he found Juarez, there was no grease on the switch that opened and closed all of the gates for the side of the barn where Juarez was found. Once Pablo Gonzalez released Juarez from the gate which had caught Juarez, Pablo Gonzalez went to the manager of the Dairy, Scott Haag (Haag), to tell him of the accident.

Haag stated that when he found Juarez, Juarez's grease bucket was on the far side of the gates where Juarez would have been greasing the gates from. Haag testified that Juarez did not have any grease on the hand with which Haag took Juarez's pulse. Before the police arrived, Haag noticed that Juarez had finished greasing all of the gates. Haag did not recall whether the switch, which opened and closed the gates on the side where Juarez was found, had any grease on it.

The barn in which Juarez was killed had twelve gates on each side, allowing twenty-four cows to be milked at a time. The process of milking the cows required first bringing the cows in from the corrals and placing the cows in a large holding pen where the cows would be washed by sprinklers. Second, twenty-four cows from the holding pen would be herded through entrance doors, with twelve cows entering in each side of the barn. During the second step, the gates would have to be closed in order to prevent the cows from walking out of the stall area, through the gates, and down the exit alley. Third, the milking would occur. Fourth, an employee would flip a switch to open the gates, which would release the cows from the stall area, into the exit alley, through the exit gates, and finally into the corrals. The gates opened and closed like bifold doors with the gates folding in towards the exit alley.

The two switches that opened the gates were inside the operator station that was located in the pit. The pit was located between and below the two rows of stalls where the cows would stand in order to be milked. Each switch controlled twelve gates located on each side of the barn. The switch that

opened and closed the gates on the side where Juarez was found, was located in the operator station, which was right below the gate where Juarez was found. Although there was testimony that an employee could stand in the stall area, flip the switch into the closed position, and run through the closing gate, Pablo Gonzalez, Haag and another Dairy employee, Jose Manuel Gonzalez (Jose Gonzalez), all testified that they had never seen Juarez flip the switch and try to run through a closing gate.

The appellants' expert, a consulting safety engineer, Jay William Preston (Preston), testified that in reconstructing Juarez's accident, there were two elements that led up to Juarez's death: (1) Juarez had to be in the closing point of the gate, and (2) the gate had to close. Preston found that there were two ways the gate could have closed: the gate could have closed as a result of someone flipping the switch to the closed position; or the operating handle was in its closed position, but the gate, because of either friction, damage or corrosion, was hung-up and did not release to the closed position until some time later while Juarez greased the gates. It was Preston's opinion that the cause of Juarez's death was that the gates were hung-up (unknown to Juarez) when Juarez was greasing them and that when the friction in the gates gave way, the gates slammed shut, catching Juarez in the pinch-point of the gate.

Jose Gonzalez testified that he worked the shift right before Juarez's shift on April 17, 1991, and that during his shift, the gates on the side where Juarez's body was found were not working well. Jose Gonzalez explained that the gates were malfunctioning by sometimes failing to close or hanging-up and then slamming shut. Jose Gonzalez stated that he did not tell anyone that night that the gates were hanging-up.

The customary manner of greasing the gates was by standing in the exit alley, facing the pit, and applying the grease to the rod on which the gate slid by standing beside the rod that was being greased. The gates were customarily greased in the open position, in order to grease the entire rod that the gates slid on. Haag stated that he never saw

anyone standing in the closure area of a gate trying to grease a gate because such a position would result in the grease falling on top of the person who was trying to grease the gate. It was standard practice to grease the gates while wearing a greasing glove. Haag stated that he had not discussed with Juarez the dangers the gates posed to operators or greasers of the gates because Haag did not think there was any danger in operating and greasing the gates in their normal operation.

It was Preston's opinion that had the Dairy instructed its employees in an electrical lockout procedure pursuant to the Occupational Safety and Health Act of 1970 (OSHA) regulations, the gates could not have slammed shut on Juarez. A lockout procedure was described by Preston as an electrical control for the compressor in the form of a switch or a lever, that would disconnect all phases of power from the compressor and facilitate the placement of a padlock or other lockout device through the handle to isolate the compressor so it would not go on. Preston testified that had the Dairy implemented a lockout procedure, Juarez would first have gone to the point of the lockout and thrown the switch which simultaneously releases the pressure on the air valve and shuts the air off from the reservoir. Juarez would then have placed a labeled padlock through the switch, closed it and pocketed the key. Next, according to Preston, Juarez would have greased the gates, returned his bucket to the proper place, discarded the glove he was working with, and unlocked the system making it operational again. When asked whether Juarez would have been hurt had he been attempting to beat the gate if a lockout procedure had been in place, Preston testified in the negative because "[t]he cylinder would have been at atmosphere [and] there wouldn't have been any pressure. It wouldn't have actuated at all and [Juarez] could have gone through that point back and forth without any problem, because [the gate] wouldn't have gone anywhere."

Haag testified that the Dairy did not have a device that would lock out the power to the gates with a padlock while the gates were being worked on by the Dairy's employees. Haag stated that the Dairy trained its employees to grease the gates by having an employee watch another employee grease the gates. Haag testified that his employers never told him to gather information about safety in agricultural settings, nor was he ever told to become acquainted with codes and regulations, including OSHA regulations, regarding safety in the barn. Frans Aardema, a co-owner of the Dairy, testified that he had no knowledge of any government regulations that relate to safety devices for fixed farm equipment such as the rapid-exit gates.

Juarez's wife, Angeles Torres Juarez, and minor children, Alberto T. Juarez and Sandra T. Juarez (collectively referred to as the appellants), brought a wrongful death action against Frans and Cornelia Aardema, husband and wife, Thomas and Mary Jane Heida, husband and wife, as individuals, and the Dairy (collectively referred to as the Dairy or the respondents), alleging the Dairy negligently caused Juarez's death and requesting damages. The appellants' claims were tried before a jury from July 26, 1993 through July 30, 1993. On July 30, 1993, the jury returned the following verdict:

> We, the jury, answer the questions submitted to us in the special verdict as follows:
>> Question No. 1. Was there negligence on the part of the Defendant which was the proximate cause of the death of Aldo Juarez?
>
> Answer: Yes, 2. No, 10.

On August 9, 1993, the district court entered a judgment on the verdict ordering the appellants to recover nothing from the respondents and the respondents to recover their costs incurred due to the appellants' action.

On August 20, 1993, the appellants filed a motion for judgment n.o.v., pursuant to I.R.C.P. 50(b), or in the alternative, a motion for a new trial, pursuant to I.R.C.P. 59(a)(6). In support of their motions, the appellants primarily argued that the alleged negligence of Juarez should not have been allowed as an affirmative defense unless the Dairy first proved that the alleged negligence of Juarez amounted to a breach of a well established and communicated policy of the Dairy pursuant to OSHA regulations. The appellants also argued that the Dairy was a proximate cause of the death of Juarez in that but for

the Dairy's failure to provide a lockout procedure, Juarez would not have had his accident.

On September 20, 1993, the district court denied the appellants' joint motion for judgment n.o.v., or in the alternative a new trial in a memorandum decision. The district court first considered the appellants' argument that by answering the jury verdict question number one in the negative, the jury found the Dairy not negligent, contrary to the evidence admitted, which proved the Dairy was negligent *per se.* The district court rejected the appellants' argument on the grounds that the nature of the jury verdict question number one required a two-part analysis. The first part of question number one was whether the jury found the Dairy was negligent. If the jury found the Dairy negligent, the jury reached the second part of question number one which required the jury to determine whether the Dairy's negligence was the proximate cause of Juarez's death. *Leliefeld v. Johnson,* 104 Idaho 357, 370, 659 P.2d 111, 124 (1983) (holding that in order to have an actionable cause of action for negligence *per se,* a claimant must prove that the negligence *per se* was a proximate cause of the claimed injury). During deliberations the jury requested the district court to clarify the definition of proximate cause. The district court responded to the jury's query by a note which stated, "[i]t is important you do the best you can with the jury instructions that you have been given."

With respect to the appellants' motion for judgment n.o.v., the district court found that there was substantial evidence to justify submitting the case to the jury. The district court noted that the issue of proximate cause is generally an issue for the jury, unless the evidence is so clear that reasonable minds could not differ as to the cause of a claimant's injuries. The district court determined that reasonable minds could have differed on the issue of whether the Dairy's negligence was a proximate cause of Juarez's death, and consequently denied the appellants' motion for judgment n.o.v. The district court denied the appellants' request for a new trial based on its finding that the jury's verdict was in accord with the clear weight of the evidence.

The appellants also contended that the district court erred in not ruling on the appellants' objection to the Dairy's misstatement of the appellants' burden of proof. During closing arguments, the appellants objected to the Dairy's suggestion that the jury would have to come to actual knowledge or would have to know what happened to Juarez before the jury could render a verdict for the appellants. The district court instructed the jury that each party had the burden of proving each proposition was "more probably true than not true" based upon all of the evidence in the case. The district court denied the appellants' motion for a judgment n.o.v. or a new trial and the appellants appealed.

## II.

### STANDARD OF REVIEW

 When reviewing a motion for judgment n.o.v., the Court should apply the same standard as did the lower court which passed on the motion originally, without deference to the lower court's views. *Pocatello Auto Color, Inc. v. Akzo Coatings, Inc.,* 127 Idaho 41, 45, 896 P.2d 949, 953 (1995). A trial judge rules on motions for judgment n.o.v. based on I.R.C.P. 50(b) with the same standard that is applied for a motion for directed verdict. *Spence v. Howell,* 126 Idaho 763, 769, 890 P.2d 714, 720 (1995). When reviewing a denial of a motion for judgment n.o.v., we review the record and draw all inferences in favor of the non-moving party to determine if there is substantial evidence to support the jury's verdict. *Young v. State Farm Mut. Auto. Ins. Co.,* 127 Idaho 122, 126, 898 P.2d 53, 57 (1995). To make this determination we ask whether we can say " 'that there can be but one conclusion as to the verdict that reasonable minds could have reached.' " *Id.* (*quoting Quick v. Crane,* 111 Idaho 759, 764, 727 P.2d 1187, 1192 (1986)).

 A new trial may be granted pursuant to I.R.C.P. 59(a)(6) if the district court finds that there is an insufficient amount of evidence to justify the jury's verdict. *Curtis v. Firth,* 123 Idaho 598, 606–07, 850 P.2d 749, 757–58 (1993). The district court may set aside a verdict even though there is substan-

tial evidence to support it. *Bott v. Idaho State Bldg. Auth.,* 122 Idaho 471, 475, 835 P.2d 1282, 1286 (1992). A district court's decision to deny a motion for a new trial will be upheld on appeal if the district court has not manifestly abused its wide discretion. *Curtis,* 123 Idaho at 607, 850 P.2d at 758. In determining whether there was an abuse of discretion by the district court, this Court must consider (1) whether the district court correctly perceived the issue as one of discretion, (2) whether the district court acted within the outer boundaries of such discretion and consistently with any applicable legal standards, and (3) whether the district court reached its decision through an exercise of reason. *O'Dell v. Basabe,* 119 Idaho 796, 813, 810 P.2d 1082, 1099 (1991). The district court must state its particular reasons for denying a motion for new trial, unless it is obvious from the record itself, by pointing to where it is shown in the record that the moving party has failed to meet its burden to justify granting a motion for a new trial. *Pratton v. Gage,* 122 Idaho 848, 852–53, 840 P.2d 392, 396–97 (1992); *Quick,* 111 Idaho at 773, 727 P.2d at 1201. This requirement was further addressed in *Pratton:*

> The requirement of *Quick v. Crane,* that the trial court must "state its particular reasons" for granting a motion for new trial is met when there is an adequate explanation to allow the reviewing court to understand the basis upon which the action was taken. The trial court must state both the factual basis for its decision and the particular rule of the Idaho Rules of Civil Procedure under which it is acting.

122 Idaho at 853, 840 P.2d at 397 (*quoting O'Dell,* 119 Idaho at 809, 810 P.2d at 1095).

### III.

### ANALYSIS

**A. The District Court Did Not Err In Concluding There Was Substantial Evidence To Submit To The Jury The Issue Of Whether The Dairy's Conduct Was The Proximate Cause Of Juarez's Death.**

The appellants argue that the district court was incorrect in not granting the appellants' motion for judgment n.o.v. because the Dairy did not meet its threshold burden of proof of showing the Dairy complied with the specific duties set forth in the OSHA regulations. The appellants also argue that, as a matter of law, the Dairy was a proximate cause of the death of Juarez, since but for the Dairy's failure to provide a lockout procedure, Juarez would not have had his accident.

The appellants' first contention that the district court erroneously gave the case to the jury because the Dairy failed to satisfy its burden of showing it complied with OSHA regulations, ignores the requisite elements for proving an actionable claim of negligence *per se.* As the defendant in this case, the Dairy is not required to prove it complied with OSHA regulations before the plaintiff has proven its *prima facie* case of negligence *per se. Sanchez v. Galey,* 112 Idaho 609, 617, 733 P.2d 1234, 1242 (1986) (requiring the violation of an OSHA regulation to be the proximate cause of the plaintiff's injuries). There was conflicting circumstantial evidence presented in this case that would support two reasonable yet independent causes of Juarez's death. The district court properly submitted to the jury the issue of whether the Dairy's negligence was a proximate cause of Juarez's death.

The appellants' argument that the district court erred in submitting the question of whether the Dairy's breach of OSHA regulations was the proximate cause of Juarez's death must also fail. The grounds for the appellants' objection is based on the appellants' assumption that the only possible cause of Juarez's death was the Dairy's failure to comply with OSHA regulations. However, the appellants' own safety expert, although he had a definite opinion as to what caused Juarez's death, testified that there was more than one possible, independent cause of his death. Preston testified that it was possible Juarez was killed as a result of the gates being hung-up and then slamming shut, or by Juarez flipping the switch to close the gates, and then trying to run through the closing gate.

There was circumstantial evidence indicating that either of these causes alone may have caused Juarez's death: (1) there was

testimony of the Dairy's employees that they had previously run through a closing gate, although there was no evidence that Juarez himself had ever done so; (2) there was testimony that Juarez was found facing the exit alley with his back to the switch and testimony that had Juarez been greasing the gates, he would have been facing the switch and would not have been standing in the closure point of the gate; (3) there was testimony (although conflicting) that Juarez was found wearing only one greasing glove, with grease on only the glove, and not on the ungloved hand, and that there was no grease on the switch that closed the gates on the side where Juarez was found; (4) there was testimony (although conflicting) that Juarez had completed greasing all of the gates at the time of his accident; (5) there was testimony that the gate in which Juarez was found was right above the switch which closed the gate Juarez was found in and there was testimony that an employee could flip that switch and run through the gate Juarez was found in; and (6) there was testimony that a motive for running through a closing gate was to gain quick access to the corrals in order to retrieve the next milking shift's cows, which was one of Juarez's duties.

No evidence has been pointed out by the appellants to show that if the Dairy had complied with OSHA regulations, Juarez would not have been killed by trying to beat the gate. Even if the Dairy had followed Preston's lockout procedure for greasing the gates, Juarez could still have completed greasing the gates, unlocked the power source, and then attempted to run through a closing gate. Inherent in the motive for running through the gates was the need to have the gates operating so that the employee could pass through the gates and have the gates close behind him.

Since there was circumstantial evidence that either of these causes alone may have proximately caused Juarez's death, the district court did not err in submitting the question to the jury of whether the Dairy's breach of OSHA regulations was the proximate cause of Juarez's death.

The appellants' contention that but for the Dairy's failure to comply with OSHA regula-

tions, Juarez's accident would not have occurred, should be rejected based on the fact that there were two possible, independent causes of Juarez's death. In *Fussell v. St. Clair*, 120 Idaho 591, 818 P.2d 295 (1991), the Court held that in multiple cause cases, where there are multiple, independent forces that may have exclusively caused the harm, the jury instruction on proximate cause should not include the "but for" portion of IDJI 230 and should only include the "substantial factor" portion of IDJI 230. *Id.* at 595, 818 P.2d at 299. The district court in this case rejected the appellants' request for a jury instruction which contained both the "but for" and the "substantial factor" tests in favor of the modified version of IDJI 230 that was approved in *Fussell*. The appellants did not object at trial to the district court's decision to use the *Fussell* jury instruction and the appellants have not raised on appeal an objection to the use of the *Fussell* jury instruction.

There was substantial, although circumstantial, evidence to justify submitting to the jury the question of whether the Dairy's breach of OSHA regulations was the proximate cause of Juarez's death. The district court did not err in rejecting the appellants' contention that, as a matter of law, the Dairy was a proximate cause of Juarez's death since but for the Dairy's failure to comply with OSHA regulations, Juarez's accident would not have occurred, given that the evidence supported two possible independent causes of Juarez's death. The district court's denial of the appellants' motion for judgment n.o.v. is affirmed.

## B. The District Court Abused Its Discretion In Denying The Appellants' Motion For A New Trial.

█ The appellants challenge the district court's denial of their motion for a new trial arguing that the jury's finding, that either the Dairy was not negligent or that Juarez was the sole proximate cause of his own death, was against the clear weight of the evidence. The appellants also contend that the district court abused its discretion by failing to state its particular reasons for denying the appellants' motion for a new trial.

The district court denied the appellants' motion for a new trial based on its finding that the jury's verdict was in accord with the clear weight of the evidence.

I.R.C.P. 59(a) provides that a new trial may be granted if the evidence is insufficient to justify the verdict. In ruling on a motion for a new trial pursuant to I.R.C.P. 59(a)(6), *i.e.*, that the verdict is not supported by sufficient evidence, the district court must weigh the evidence and determine whether the verdict is in accord with the court's assessment of the clear weight of the evidence. *Pocatello Auto Color, Inc. v. Akzo Coatings, Inc.*, 127 Idaho 41, 45, 896 P.2d 949, 953 (1995). In determining whether to grant or deny a motion for a new trial, the trial court is vested with broad discretion, and an appellate court "will not overturn an order of the trial court denying a motion for a new trial unless the trial court has manifestly abused its discretion." *Lankford v. Nicholson Mfg. Co.*, 126 Idaho 187, 188, 879 P.2d 1120, 1121 (1994). As previously stated, the trial court must state its reasons for denying a motion for a new trial with particularity unless it is obvious from the record. *Pratton v. Gage*, 122 Idaho 848, 852–53, 840 P.2d 392, 396–97 (1992).

There was no conflicting evidence with respect to the fact that the Dairy did not comply with the OSHA regulation at issue in this case. That regulation provides, in pertinent part:

**Guarding of farm field equipment, farmstead equipment, and cotton gins.**

(a) *General*—(1) *Purpose.* The purpose of this section is to provide for the protection of employees from the hazards associated with moving machinery parts of farm field equipment, farmstead equipment, and cotton gins used in any agricultural operation.

(6) *Operating instructions.* At the time of initial assignment and at least annually thereafter, the employer shall instruct every employee in the safe operation and servicing of all covered equipment with which he is or will be involved . . .

29 C.F.R. § 1928.57(a)(6). One of the safe operating practices required by the regulation is to "[l]ock out electrical power before performing maintenance or service on farmstead equipment." 29 C.F.R. § 1928.57(a)(6)(v). Appellants' expert witness testified that had such a lockout procedure been instructed by the Dairy, the gates could not have slammed shut on Juarez. Both the owner and the manager of the Dairy testified that no lockout procedure was instructed or utilized by the Dairy. In fact, Frans Aardema testified that he had no idea such a safety regulation even existed.

On the issue of causation, the clear weight of the evidence supported the appellants' contention that the failure of the Dairy to instruct employees on a lockout procedure was a substantial factor in bringing about the accident that caused Juarez's death. As to whether Juarez got caught while working on the gate when it "hung up" and slammed shut by itself, that scenario again raises the issue whether the Dairy complied with the OSHA regulation requiring instruction on locking out the power source to the gates before maintenance is performed on them. Had the regulation been followed, the gate could not have gotten hung up and then slammed shut by itself. The testimony of Jose Gonzalez that the gate where Juarez's body was found had been "hanging up" on the night of the fatal accident is strong circumstantial evidence in support of the theory advanced at trial by appellants.

In contrast, the main theory of the cause of the accident advanced by the Dairy is supported by circumstantial evidence of much less weight. The Dairy argued that Juarez was killed because he activated the power switch himself and then tried to run through the gate. There was evidence that other employees on occasion had run through the gate, but there was no evidence that Juarez himself had ever done so. Although the evidence about other employees' conduct and evidence concerning the appearance and position of Juarez' body provide enough evidence to support the district court's determination to submit the issue of causation to the jury, this evidence does not support the district court's conclusion as to the clear weight of the evidence. Moreover, the other theories suggested by the Dairy, that third persons killed Juarez, or that he committed suicide, are pure speculation. There was

evidence that Juarez got along well with his co-workers, and that he was happily married with children and had no reason to take his own life.

Thus, based on the record at trial, we hold that the clear weight of the evidence did not support a verdict of no negligence on the part of the Dairy and 100% negligence on the part of Juarez, or of no causation due to the Dairy's negligence.

Furthermore, the trial court failed to state with particularity its reasons for denying the motion for a new trial. The only comment made by the Court in its memorandum decision concerning the motion for a new trial was: "Obviously, where the Court concurs with the verdict as rendered, as does this Court, then a new trial should not be granted." The district court did not state any reason based on the trial record for its decision to deny the appellants' motion for a new trial. The trial court's reasoning cannot be gleaned from the record, especially in view of the appellants' expert's testimony that it did not matter how or why Juarez became trapped in the gate; what mattered was that compliance with OSHA would have absolutely prevented the accident.

The record does not support the jury's verdict and the district court should therefore have granted a new trial pursuant to I.R.C.P. 59(a)(6); additionally, the district court failed to state its reasons for denying the new trial motion. For these reasons we vacate that portion of the district court's order and remand for a new trial.

Because we remand the case for a new trial, we need not address the appellants' argument that the district court erred in not ruling on the appellants' objection to the Dairy's misstatement of the appellants' burden of proof during closing arguments.

### IV.

### CONCLUSION

We hold that the district court correctly denied appellants' motion for judgment n.o.v. pursuant to I.R.C.P. 50(b). There was enough evidence to justify submitting to the jury the question of whether the Dairy's breach of OSHA regulations was the proximate cause of Juarez's death.

We further hold, however, that the district court abused its discretion in denying appellants' motion for a new trial pursuant to I.R.C.P. 59(a)(6). The finding of no negligence or causation by the Dairy was contrary to the great weight of the evidence.

Accordingly, we affirm that part of the district court's order denying appellants' motion for judgment n.o.v., and vacate the part of the order denying their motion for a new trial. The case is remanded for further proceedings consistent with this opinion.

No attorney fees on appeal. Costs on appeal to appellants.

JOHNSON, J., and TRANSTRUM, J. Pro Tem., concur.

McDEVITT, Chief Justice, dissenting.

I am compelled to dissent from the Court's opinion.

Under section I of the Court's opinion, FACTS AND PROCEDURAL BACKGROUND, it correctly relates the evidence that was before the Court: "Before the police arrived, Haag noticed that Juarez had finished greasing all of the gates." The evidence was uncontroverted that Juarez had in the words of Haag "finished greasing all of the gates." There was, therefore, no reason for an electrical lockout procedure pursuant to the Occupational Safety & Health Act of 1970 (OSHA) regulations. NO ONE WAS WORKING ON THE GATES. THE WORK HAD BEEN COMPLETED.

Clearly the jury could discern that there was no factual predicate for Preston's opinion that Juarez was killed while working on the gates.

SCHROEDER, J., concurs in dissent.